¶ 1. Terence Lowery[1] and Lisa Mardis were divorced on July 19, 1990. Joint legal custody of Nicholas Lowery, the minor child of the parties, was awarded to both parents, with Lisa to receive physical custody of Nicholas. On June 23, 1997, Terence filed a petition with the court to receive physical custody of Nicholas and an order of modification was entered on September 8, 1997, awarding custody of Nicholas to Terence. Lisa filed a motion for emergency relief on August 15, 2001, in order to obtain temporary custody of Nicholas. The motion was granted and the court set the matter for review. At the review hearing, on August 22, 2002, the court awarded legal and physical custody to Lisa. Terence filed a motion to reconsider which was denied by the court on August 26, 2002. Feeling aggrieved, Terence appeals the following errors: *Page 1055 
 1. WHETHER THE CHANCELLOR ERRED WHEN HE FAILED TO SPECIFICALLY ADDRESS THE ALBRIGHT FACTORS IN MODIFYING CUSTODY OF THE MINOR CHILD.
 2. WHETHER THE DECISION OF THE CHANCELLOR TO MODIFY CUSTODY OF THE MINOR CHILD WAS ERRONEOUS AND AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 2. Finding merit in Terence's argument that the chancellor failed to specifically address the Albright Factors, we reverse and remand to the trial court for application of Albright.
 FACTS
¶ 3. Terence Lowery and Lisa Mardis were married on October 2, 1982. Nicholas was born out of this marriage on June 9, 1986. The couple divorced on July 19, 1990, with joint custody of Nicholas to be shared between the two. During the school year, Nicholas was to reside with Lisa with visitation granted to Terence on the weekends and holidays. Terence was to be the primary care-giver during the summer months.
¶ 4. Nicholas failed the fifth grade, and Terence filed for a reversal of the original custody decree asking the court to appoint him as the primary caregiver during the school year with Lisa as the primary caregiver during the summer. The court granted the request on September 8, 1997.
¶ 5. Terence took Nicholas to Dr. William T. Osborne with complaints of disciplinary problems. Previously, Nicholas had been diagnosed with attention deficit disorder. Dr. Osborne evaluated Nicholas and diagnosed him with oppositional defiant disorder. Dr. Osborne prescribed a program of treatment using behavioral management. Nicholas' program required the use of daily report sheets to be completed by teachers and returned to Nicholas' parents. Under the program, points were awarded to Nicholas for good behavior and good performance at school. When Nicholas accumulated a certain number of points he was allowed to participate in activities that he enjoyed. Nicholas was disciplined by deducting points, restricting certain activities and requiring that he run laps.
¶ 6. Lisa filed a petition for modification of custody on August 14, 2001. She also filed a motion for emergency relief the same day claiming Terence posed a danger to Nicholas.
¶ 7. A hearing was set for August 22, 2001. Numerous witnesses testified at the review hearing including Nicholas' school principal, Ben Burnette, who testified that Nicholas exhibited classroom behavior problems at the school. He stated that Nicholas had a history of untruthfulness. Burnette said he communicated with Terence by completing the daily report sheets. Burnette stated that Nicholas' behavioral problems were most severe when he arrived in the sixth grade but diminished somewhat in later grades.
¶ 8. Terence testified at the hearing and explained the course of treatment that was used in an effort to correct Nicholas' behavior problems. He discussed Dr. Osborne's program and explained how he rewarded Nicholas for good behavior and disciplined Nicholas when he behaved in an unacceptable way. Terence said Nicholas' grades improved under his care. He also said Nicholas exhibited more defiance towards him and people in positions of authority following visitations with Lisa.
¶ 9. Under cross-examination Terence admitted that he locked Nicholas out of the house unless a parent was present. *Page 1056 
Terence claimed the periods of time Nicholas was locked out of the house were short and caused no harm to Nicholas. He said Nicholas could contact one of the neighbors if an emergency arose. He said the Department of Human Services investigated a complaint Lisa filed against him because he locked Nicholas out of the house. He said the Department of Human Services took no action. Terence admitted that he eavesdropped on Nicholas' telephone conversations and that he monitored Nicholas' email account.
¶ 10. Anna Lowery, Nicholas' stepmother, testified that Nicholas' behavior would improve until he had contact with Lisa. She also refuted Nicholas' allegation that she slapped him during an argument between the two. Anna said she threw a towel at Nicholas after he refused to run a lap. She stated that Nicholas used profanity as he walked away from her, and Terence became involved in the argument. It was alleged that Terence physically restrained Nicholas and Anna slapped him. Afterwards, Nicholas told a neighbor that he was being abused, but the Department of Human Services and sheriff's department declined to take any action in the matter. Nicholas' tenth grade teacher, Tara Gardner, testified that Nicholas, on one occasion, changed a daily report sheet, and she notified Terence. Gardner stated that she was very impressed with the concern for Nicholas' welfare shown by Terence and Anna.
¶ 11. After the hearing the court, in its interim judgment, found the actions of Terence posed a threat to the minor child creating potential physical and emotional damage to Nicholas. The trial judge found one of the greatest risks to Nicholas was caused by Dr. Osborne's counseling "who is not medically trained and . . . was the former pastor of the church" that Terence and Anna attended. The court found the course of treatment recommended and approved by Dr. Osborne bizarre. The court awarded custody of Nicholas to Union County Department of Human Services and recommended medical and psychiatric treatment for him.
¶ 12. Pursuant to the court's order, Nicholas was evaluated by Dr. Malachy McCool. Following the evaluations, the court reconvened on March 14, 2002. At that hearing, Nicholas said that he wanted to live with his mother. He denied Terence's allegation that a sexual experience had occurred between him and a girl. Nicholas admitted that he was going to fail two classes that school year but said that he planned to attend summer school in order to pass the tenth grade. Nicholas stated that Lisa required him to follow reasonable rules but Terence always belittled him. Nicholas said he could be more open with Lisa. During Lisa's testimony, she admitted making two reports of abuse against Terence which were never substantiated. She denied that Nicholas used tobacco, alcohol, or drugs despite statements Nicholas allegedly made to Dr. Osborne and Mr. McCool.
¶ 13. Devan Roberts, an employee of the Union County Department of Human Services, testified that he investigated the abuse allegation pertaining to Terence's locking Nicholas out of the house. He found no evidence of neglect. Robert's report noted that Nicholas seemed to be caught in the middle of his parents' arguments and was at high risk for emotional abuse. Roberts referred to Dr. McCool's report which indicated that Lisa and Terence ascribe to different approaches to parenting. Terence has a strict structural approach while Lisa is more relaxed in her style. He opined that Nicholas had regressed since returning to Lisa's custody. The report noted that Nicholas was troubled *Page 1057 
by the feuding between Terence and Lisa.
¶ 14. The court entered its judgment on August 26, 2002, holding that Nicholas strongly preferred to live with Lisa and found that it was in Nicholas' best interest for Lisa to have custody. The court specifically held that Dr. Osborne was having an adverse effect on Nicholas. The court's ruling found Terence's conduct to pose a threat to Nicholas' emotional well-being, but the ruling made no reference to theAlbright factors. Terence filed a motion for reconsideration which was denied on November 8, 2002.
 STANDARD OF REVIEW
¶ 15. Our standard of review is clear. "Chancellors are vested with broad discretion, and this Court will not disturb the chancellor's findings unless the court's actions were manifestly wrong, the court abused its discretion, or the court applied an erroneous legal standard."Mixon v. Mixon, 724 So.2d 956, 959 (¶ 8) (Miss. Ct. App. 1998). "However, where the chancellor improperly considers and applies theAlbright factors, an appellate court is obliged to find the chancellor in error." Hollon v. Hollon, 784 So.2d 943, 946 (¶ 11) (Miss. 2001) (citing Jerome v. Stroud, 689 So.2d 755, 757 (Miss. 1997)).
 1. WHETHER THE CHANCELLOR ERRED WHEN HE FAILED TO SPECIFICALLY ADDRESS THE ALBRIGHT FACTORS IN MODIFYING CUSTODY OF THE MINOR CHILD.
¶ 16. The polestar consideration in child custody cases is the best interest and welfare of the child. Albright v. Albright,437 So.2d 1003, 1005 (Miss. 1983). The Albright case provided Mississippi courts with guidelines for determining the best placement of the child when adjudicating custody disputes. These factors include: (1) age, health and sex of the child; (2) identifying the parent who had the continuity of care prior to the separation; (3) which parent possesses better parenting skills and who has the willingness and capacity to provide primary child care; (4) the employment of the parents and responsibilities of their respective employment; (5) physical health, mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of parents; (8) the home, school and community record of the child; (9) the preference by law; (10) stability of the home environment; and (11) other factors relevant to the parent-child relationship. Albright, 437 So.2d at 1005. Marital fault should not be used as a sanction in the custody decision, nor should differences in religion, personal values or lifestyles be the sole basis for custody decisions. Id.
¶ 17. The Mississippi Supreme Court has held that the chancellor should properly make findings of fact on the record as to the various factors under Albright. Sobieske v. Preslar, 755 So.2d 410, 413 (¶ 12) (Miss. 2000). The court has held that it is erroneous for a chancellor to fail to make a thorough discussion of the Albright
factors. Powell v. Ayars, 792 So.2d 240, 249 (¶ 33) (Miss. 2001).
¶ 18. In the case at bar, the chancellor did not recite any of theAlbright factors. Nor, did he specifically mention the Albright case or its factors in his ruling. Therefore, the chancellor erred as a matter of law in failing to analyze and make proper findings as to each factor under Albright. Accordingly, the case is remanded to the trial court for application of the Albright factors. Finding this issue dispositive of the case, we do not address the other issue on appeal.
¶ 19. THE JUDGMENT OF THE CHANCERY COURT OF UNION *Page 1058 COUNTY IS REVERSED AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THISOPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
McMILLIN, C.J., KING AND SOUTHWICK, P. JJ., BRIDGES, THOMAS, LEE,IRVING, MYERS AND GRIFFIS, JJ., CONCUR.
[1] Terence's name was spelled several different ways on documents filed in this cause: however, for purposes of this appeal we have chosen the "Terence" spelling.