WILSON, J.,
concurring in part and dissenting in part:
¶ 22. I agree with' the majority that the order modifying custody must be reversed because the chancellor failed to discuss the Albright factors.[1] However, I ■ conclude that the chancellor’s finding of a material change in circumstances is neither manifestly in error nor legally erroneous.[2] Therefore- I would -remand rather' than render.
¶ 23. Ás the majority correctly states, when, as in this case, “there is no specific identification of the alleged change in circumstances, this Court is placed in the position of attempting to guess what the chancellor determined was a proper basis for a change in custody.”[3] However, in the case, the basis of the chancellor’s ruling is fairly clear from the record. It starts with the testimony of the parties’ son, Gavin, who testified that he would like to alternate weeks -with his parents, one week with his dad and one week with his mom. Gavin was three years old. at the time of his parents’ divorce in 2004 and was nine years old the last.time the chancery court addressed the issue of his custody in 2010. He had turned thirteen, by the time of the hearing and order at issue in this appeal, and he will be almost fifteen years old by .the time this Court’s decision is handed down.
¶ 24. Gavin testified under oath that his desire to alternate weeks was not bom out of any grievance against his dad. Nor did he think that he could “get by with more stuff at [his] mom’s.” Nor had his mom promised him anything as an inducement. Rather, he wanted- to alternate weeks because he wanted to spend more time with *323 his mom and his three (now four) siblings or half-siblings who live with her and with whom he is “close.” Gavin testified that on occasions he had asked his dad to allow him to spend an extra couple of hours at his mom’s house because, -.for example, he wanted to see his half-brother (whose own visitation schedule sometimes conflicts with Gavin’s) or he wanted to stay for a dinner with his grandmother. Gavin testified that his dad’s answer was always “no” and that his dad often said that he could not stay longer because of the “court order.” (The prior court order, of course, did not prohibit additional visitation — it just did not require it.) Gavin testified: “He doesn’t understand ..... He’s trying to ... hurt my mom, but he’s also hurting me too.” (In contrast, Gavin testified that his mom had allowed him to go on vacation with his dad even though it conflicted with her visitation.) Gavin testified that he had tried to talk to his dad about the issue and his feelings, but his dad was unwilling to talk about it.
¶ 25. Greg’s testimony essentially confirmed Gavin’s. For instance, when no one picked Gavin up from school one day because of a misunderstanding, Greg refused to allow Catherine, who lives nearby, to pick him up, even though that meant that Gavin had to wait at the school longer. When questioned about the incident, Greg testified as follows:
Q. Why didn’t you want her to pick him up that day?
A. I don’t think her environment’s fit. I’ve said that multiple times.
Q. Period. You — Absolutely, your position is he does not need to be exposed to his own mother one more minute than he has to be?
A. Yes, in a way.
Q. Well yes or no?
‘A. Yes, I feel that way.
¶ 26. The remainder of Greg’s testimony confirmed that he was unwilling t.o consider any request by Gavin,.to spend “one more minute” with Catherine beyond what was mandated by court order. He admitted,, for example, that he had ¡ never allowed Catherine ,to pick Gavin up from school, even though she apparently lives less than-five minutes from-¡the. school. And while Greg, did indeed'repeat a number of times that the “environment” at Catherine’s house was not “fit,” he was unable -to articulate .what this meant. When asked by the chancellor to explain, he responded, “Her environment at her house. Her beliefs. Everything that goes on.” He finally mentioned Catherine’s tattoos and- that her new husband owns a tattoo parlor as issues,. However; any claim of unfitness was unsubstantiated on the record. . Gavin testified that Catherine lived in a neighborhood of single-family homes where there were other kids to play with, her home was less than ten minutes from Greg’s and in the same school district, and Greg admitted that he had never even been inside Catherine’s house. This is all relevant not because the law saddles Greg with any burden to prove that Catherine’s home is' unfit (see ante at ¶ 16) but only because Greg inserted the issue into the case in an effort to justify his actions, Thus, the lack of evidence to support Greg’s assertions was‘relevant to the chan-' cellor’s evaluation of his conduct and credibility,
¶ 27. After hearing the witnesses’ testimony. and judging their credibility,[4] the chancellor concluded, in the course of her oral ruling, that there was no evidence that *324 either Catherine’s home or the environment there was unfit, that Greg’s actions and his justifications for them were unreasonable (“bullcrap”) and were hurting Gavin, that Gavin needed a relationship and to spend time with both parents, and that it was appropriate to modify custody before Gavin came to further resent the unnecessary restrictions that Greg was placing on Gavin’s time with his mom and her family. The chancellor commented that Gavin was “more mature than either one of’ his parents and that-his preference derived from his love for both of them and his siblings. I submit that these findings were sufficient to support the chancellor’s finding that a material change of circumstances that adversely affected Gavin had occurred, are supported by substantial evidence, and are not manifestly erroneous.
¶28. As the majority points out, a “child’s expression of preference ..., supported by nothing more,” is not “the type of adverse change in material circumstances that would warrant a custody modification.” Best v. Hinton, 838 So.2d 306, 308 (¶ 8) (Miss.Ct.App.2002) (emphasis added). But the chancellor certainly is entitled to consider as part of her findings the sworn testimony and preference of “a child, of some age over twelve years,” to the extent that the child can “articulate compelling reasons as to why a change of custody would be in [his] best interest.” Id. at 309 (¶ 11). Furthermore, “[t]he concept” of a material change in circumstances adversely affecting the child “is intended to encompass its broadest possible meaning in order to protect children,” including changes that negatively impact the “child’s mental and emotional well-being.” Marter v. Marter, 914 So.2d 743, 748-49 (¶ 14) (Miss.Ct.App.2005) (citing Bredemeier v. Jackson, 689 So.2d 770, 775 (Miss.1997)).
¶29. The majority, having read the transcript, finds that only “Gavin’s hurt feelings” are involved. However, the chancellor — having personally observed Gavin, Greg, and Catherine[5] — was impressed with Gavin’s maturity, she found his testimony credible, and, although perhaps her findings could have been more specific, it is clear that the chancellor believed that the issues Gavin articulated amounted to legitimate harm to his emotional well-being, not just hurt feelings.[6] Even if I might not have reached the same conclusion — which I am unable to say with confidence, since I was not there — I do not believe that the chancellor’s finding of a material and adverse change in circumstances was manifestly or clearly erroneous.
¶ 30. Nor, contrary to what the majority suggests, did the chancellor base her ruling on the typical “anxiety” that children feel as a “foreseeable, indeed expected, ... consequence of divorce” itself. Ante at ¶ 17 (quoting Lambert v. Lambert, 872 So.2d 679, 684 (¶ 19) (Miss.Ct.App. 2003)). In Lambert, this Court reversed a *325 ruling granting a motion to modify custody that was filed only three months after the parties’ divorce. Lambert, 872 So.2d at 682 (¶ 10). And in that case, the child’s anxiety was caused by the custody dispute itself. Id. at 686 (¶ 27). Here, in contrast, the chancellor found a change in circumstances based on avoidable conflict that arose nine years after the parties’ divorce. Lambert is simply inapposite.
¶ 31. I agree with the majority that the chancellor easily could have modified the visitation schedule based on the evidence in the record,[7] but that is not a reason for reversal. I also agree that we must reverse because the Albright factors were not discussed, but for the reasons explained above I would remand rather than render.
IRVING AND GRIFFIS, P.JJ., AND ' JAMES, J., JOIN THIS OPINION.

. See Lowery v. Mardis, 867 So.2d 1053, 1057 (¶¶ 17-18) (Miss.Ct.App.2004).

. See Powell v. Ayars, 792 So.2d 240, 243 (¶ 6) (Miss.2001).

.Sturgis v. Sturgis, 792 So.2d 1020, 1025 (¶ 19) (Miss.Ct.App.2001).

. See Powell, 792 So.2d at 243 (¶ 6) ("It is for the chancellor to determine the credibility and wéight of evidence.").'

. "This Court gives deference to a chancellor's findings in regard to witness testimony, because the chancellor is able to observe and personally evaluate the witnesses’ testimony and the parties' behavior.” McNeese v. McNeese, 119 So.3d 264, 275 (¶ 32) (Miss. 2013) (internal quotation marks omitted). "[Slitting as an appellate court reviewing a cold record, we are not in a position to second-guess the chancellor’s interpretation of something as complex and personal as the relationship between [parents] and [their] teenage [children].” Blakely v. Blakely, 88 So.3d 798, 802 (¶ 11) (Miss.Ct.App.2012).

. In her ruling from the bench, the chancellor concluded that "the fact that he is expressing to us that he’s hurt by being kept away from his mom and being so restricted from her, and that he is feeling some resentment ... is just the bubbles of something boiling under the surface.”

. However, an order that "in essence modified .., custody” while purporting to address only visitation would have been subject to the same legal standards as a modification of custody. Johnson v. Johnson, 913 So.2d 368, 371 (¶ 11) (Miss.Ct.App.2005).