MAXWELL, J.,
for the Court:
¶ 1. Lauren Wilson[1] appeals from the Rankin County Chancery Court’s grant of a modification of child custody to her husband, Michael Wilson. The chancellor found a material change in circumstances adverse to the children had occurred since the original custody order. He also found a change from Lauren having primary physical custody to the parties having joint physical custody was in their two minor children’s best interests.
¶ 2. The chancellor found Lauren had filed a baseless child-abuse complaint against Michael, which had deprived him of visitation with his children for a number of months. The chancellor also concluded that Lauren had fostered an environment that caused the children, particularly the older child, to have severe anxiety about seeing their father. On appeal, Lauren primarily argues the chancellor was biased against her and that he entered a custody order clearly reflecting that bias. Though this issue is procedurally barred, we find no merit to her allegations of judicial impropriety. Finding no manifest error in the chancellor’s judgment, we affirm.
FACTS
I. Background
¶ 3. The chancellor granted Lauren and Michael an irreconcilable-differences divorce on August 17, 2007. The chancellor’s final judgment incorporated the parties’ agreement for the custody of their two minor children, Jane and Emily. At that time, Jane was three years old, and Emily was one year old. The chancellor awarded Lauren primary physical custody of the children with the parties having joint legal custody.
¶ 4. The agreement granted Michael extensive visitation. It provided that Michael kept the children every third week. Michael had the children every Wednesday night, except the third Wednesday night of each month, when Lauren kept them. Finally, the custody order provided that after August 1, 2009, Michael’s visitation with the children would be reduced to every other weekend and every other Wednesday night.[2]
II. Youth Court Proceedings
¶ 5. On December 29, 2009, Lauren filed an “Abuse/Neglect Complaint” alleging that “[Jane] revealed in counseling [on] 12/28/09 that her father has been hitting her on the rear end, head, and kicks her.” On December 30, 2009, the youth court awarded temporary custody to Lauren and ordered that there be no contact of any kind between the two children and Michael. After a hearing on January 4, 2009, the youth court entered a “Shelter Order.” *554 It continued the period of no contact between Michael and the children “until further Order of [the] Court after ... interviews have been completed and findings reported to [the] Court.” On March 24, 2010, the youth court vacated its no-contact order as to Emily only.
¶ 6. After investigating the alleged abuse, the Mississippi Department of Human Services (DHS) recommended that the youth court take “No Action.” According to a DHS’s report issued on May 17, 2010, “the agency did not [find] any evidence to support the allegations of physical abuse [of Jane]. The child didn’t disclose any information that would verify ... any physical abuse.” Clinical psychologist Dr. Criss Lott also submitted a status report to the youth court on May 4, 2010. According to Dr. Lott’s report, Jane claimed her father had “hit and kicked” her. But Dr. Lott added: “When asked to describe the hitting and kicking, [Jane] said that her father would play with her and would hit and kick her.” When Dr. Lott asked Jane what her father “could do to make things better with her,” Jane replied, “Pay your money.”
¶ 7. After meeting with Jane on several occasions and interviewing both parents, Dr. Lott concluded Jane had “not been abused.” He believed “her antipathy toward her father is primarily due to the conflict between her parents.” In his opinion, Jane’s “comment that the father needs to ‘pay your money’ clearly reflects this fact, and reflects that this child is privy to information that should only be discussed by the parents.”
¶ 8. Based on the reports submitted by DHS and Dr. Lott, the youth court on May 17, 2010, dismissed the matter and vacated its previous custody and no-contact orders.
III. Chancery Court Claims
¶ 9. On January 1, 2010 — shortly after commencing youth-court proceedings— Lauren moved the chancellor to modify the custody and visitation arrangement established by the August 17, 2007 order. Lauren alleged a material change in circumstances had occurred because “[d]ue to the actions of [Michael], the Youth Court of Rankin County, Mississippi^] has entered a No-Contact Order, prohibiting contact between [Michael] and the ehildren[.]” Michael filed an answer claiming Lauren had made “spurious allegations” in the youth court. He also contended she had denied him visitation with the children in violation of the custody order. Relying on these same allegations, Michael counterclaimed for a modification of custody.
IV. Jane’s Mental and Emotional Health: Brenda Donald’s Assessment
¶ 10. The chancellor heard the modification action over two days — June 23, 2010, and June 24, 2010.
¶ 11. Brenda Donald, a licensed social worker, testified as an expert in child, adolescent, and family therapy. She found Jane had developed severe anxiety since the original custody order and had been engaging in several types of self-harm. According to Donald, Jane “was pulling her hair out. She was picking at her skin to the point that there was bleeding[.]” Jane also “had pulled or broken teeth out, four teeth, in a very short period of time,” which Donald found was “very unusual.” Donald noted that Jane, “after being toilet trained,” had suddenly begun urinating on herself. She found this unusual because Jane is “very bright.... [S]he’s fairly mature for her age in that I would think that it would embarrass her to wet in front of her peers, and ... this year in school she’s had numerous wetting accidents.”
¶ 12. Donald was fairly specific in identifying relevant dates. She first saw Jane *555 in 2007 in the aftermath of her parents’ divorce. She then did not see Jane for over a year. On September 1, 2009 — immediately following the reduction in Michael’s visitation with the children under the original custody order — Donald received a call from Lauren informing her Jane “was extremely anxious again.” Jane had begun pulling her hair out, picking at her skin, breaking her teeth, and urinating on herself. In November 2009, Jane showed some signs of improvement and was responsive during therapy. But Donald explained that by the next meeting on December 3, 2009, Jane had significantly regressed and was so “upset” that Donald had to cancel the therapy session for that day. During meetings on December 8, 2009, and December 11, 2009, she thought Jane seemed to be improving again. But then on December 28, 2009, Jane “was absolutely hysterical. She would not look at [Donald]. She was screaming. She was grabbing at her mother. She was just stomping and carrying on.... [T]his child was an emotional wreck.” Donald testified that during this meeting, Jane was “in the same shape she was in when [Donald] first saw her ... in September of '09[.]” During the December 28 meeting, Jane allegedly revealed her father had physically abused her.
¶ 13. Donald explained that Jane became reluctant to speak with her during December 2009. Donald’s “impression was that [Jane] seemed to think that there [were] some consequences [from] speaking to [Donald].” She described Jane’s behavior as “silent avoidance.” Following the December 28 meeting, Donald did not see Jane again for over a month. Because communication problems persisted when therapy sessions resumed in mid-February 2010, she advised Lauren to look for another therapist with whom Jane felt more comfortable. Soon after, full responsibility for counseling the family was shifted to Dr. Lott. Donald’s final session with Jane was on March 25, 2010.
¶ 14. Despite her communication difficulties during 2010 sessions with Jane, Donald testified Jane’s anxiety improved while the youth court’s no-contact order was in effect. But when asked if Jane’s anxiety increased after the youth court lifted its no-contact order and visitation with Michael had resumed, Donald explained, “if there’s been an increase, not to the level it was.”
V. Dr. Lott’s Assessment
¶ 15. Dr. Lott testified as an expert in psychology. His conclusions were more specific than Donald’s in identifying the problems underlying Jane’s behavior. Dr. Lott explained that Jane’s strong antagonism toward her father was “primarily due to the parents’ hostile relationship toward each other.” Dr. Lott believed Jane had been “simply reflecting and mirroring the hostilities that she was seeing between Mom and Dad[.]” And his “clinical impression” was that Jane had been “internalizing a lot of the anger and behavior that she sees with Mom ... and the conflict that she’s observed between Mom and Dad over time.” Dr. Lott further opined that Jane had been “basically defending and protecting Mom.... I think that’s largely what this behavior is all about. It[ ] [has] less to do with her fear and anxiety of Dad than it [has] to do with her anger and defense of Mom. That’s my opinion.”
¶ 16. Dr. Lott met with Jane and both parents on multiple occasions in 2010. But one particular interview stood out to Dr. Lott in his assessment of Jane’s behavior. In response to a question about how her father could improve their relationship, *556 Jane replied: “Pay your bills.”[3] Dr. Lott explained the significance of Jane’s response:
I made a comment in my report that to me really sum[med] it up. When I asked [Jane — ]and Mom and Dad were present[ — ]what could Dad do — and I think Mom may have even helped phrase the question as well, what can Dad do — I was trying to get [Jane] to express to us what can Dad do to heal this situation, and she said, [“]Pay your bills.f”] Now, that to me was extremely telling. Okay. Which meant that this wasn’t just about how you were treating me, this is about how you were treating us, okay, and I found that very, very clinically telling.
At another point, Dr. Lott summarized Jane’s thought process this way: “[I]n this case[,] I think ... what Jane’s saying [is], [’]You’re hurting my mama, so you’re hurting me.[’]”
VI. Allegations of Physical Abuse
¶ 17. Donald testified that during a meeting with Jane and her mother on December 28, 2009, Jane stated “that her dad — I couldn’t understand her honestly very well[ — ]but it was something about being hit and kicked by her dad[J” Donald also recalled Jane told her mother that her “daddy’s mean,” and that “[h]e hits and kicks[.]” But Donald “couldn’t see where she was pointing” or read her “facial response.” At another point, when asked what she understood Jane to say, Donald testified: “Something about being hit and kicked, and the mother said she thought — I think the mother said she thought in the head, but I could not hear that. That was not discernable to me.” She explained that Lauren “was sitting where she could hear the child better[.]” ¶ 18. Donald received a phone call from Lauren on the evening of December 28, 2009. During their conversation, Lauren told Donald she had made contact with a Rankin County Youth Court prosecutor who is a close personal friend of Lauren’s. Lauren also asked if Donald had reported the alleged abuse to DHS. Donald explained:
And, honestly, I had not [reported the alleged abuse] because I wasn’t sure that it rose to the level of — I just wasn’t sure. I just was — I hear every day about children being spanked or whatever, but I had not heard it clearly and I wasn’t sure what [Jane] was saying, except something about her dad and so — I just assumed I would see her again, but I went ahead and made a report to DHS because my understanding was that the mom had already made that contact and I felt like I needed to go ahead and just follow up with it so I did.
When pressed on cross-examination about whether she felt there was enough information based on the December 28 meeting with Jane to report physical abuse to DHS, Donald testified:
A. I didn’t really know. I mean, I’m just saying I don’t know. I mean, I felt like it was borderline. I did not — because of the way the information was presented to me with the child screaming and not being able to hear her myself, I felt like it was — I felt like I needed to go ahead, and partially because the mom had made the report as well; but in my judgment I just didn’t feel like I could make a clear discernment on that.
[[Image here]]
*557 Q. So you thought there was enough information at that time to report it.
A. I don’t know that I thought—
Q. Ma’am, that’s yes or no and then you can explain it, but you get to answer that yes or no.
A. That particular day, no, I didn’t feel like I had adequate information.
Though Donald testified to her lack of evidence of abuse, she still reported the alleged abuse to DHS on December 29, 2009, the day after her interview with Jane and the phone call from Lauren. Donald acknowledged she had received no additional evidence between December 28 and December 29 indicating physical abuse had occurred. Donald further admitted she probably would not have reported the incident to DHS when she did, had it not been for Lauren’s phone call to her on the evening of December 28. Donald offered the following explanation:
Q. And what information did you get from the 28th through the 29th other than [Lauren had] called the prosecutor to give you any more information on this?
A. I didn’t. I didn’t. I called and told them [ (DHS) ] ... that I just didn’t know if I should — what I should do, but that I felt like given the fact that it had come up and that she had talked about making a report that I felt like I needed to just leave that to them to do the investigation on it. I told them I could not hear clearly what the child said.
¶ 19. During Donald’s testimony, she read a letter allegedly written by Jane on March 30, 2010. Michael’s attorney objected to the letter’s admission. He argued: “If the child can’t testify, then ... a letter ought not to be admissible either.” The record shows the chancellor did not rule on the objection. But apparently, Donald was permitted to testify to the content of the letter, which read:
Daddy, I love you. I miss you. I wish you would not hit me and kick me hard when we play. Don’t do it hard. I don’t like for you to spank when you get so mad. It scares me. Mom and you should not be mean and get along with each other. I love you, Dad. Love, [Jane].
(Emphasis added). Donald did not find this letter indicated any abuse had occurred. Nor did she identify any evidence from Jane’s counseling sessions to support Lauren’s allegation that Michael had abused Jane. Indeed, Donald believed the youth court properly vacated its no-contact order. She found that “[Jane] needs both parents.... Both children need both parents.”
¶ 20. Dr. Lott’s opinion about the lack of abuse was more emphatic than Donald’s. He specifically found that “absolutely no abuse” had occurred. He explained that Jane had initially said “there’d been hitting and kicking.” However, Dr. Lott clarified that “when I got [Jane] to demonstrate to me and to tell me what had happened, she said it was in the course of play.” Dr. Lott, like Donald, identified no evidence supporting that Jane had been physically abused by her father.
¶ 21. Dr. Lott also highlighted that Jane’s explanations of her relationship with her father simply did not square with the allegations of abuse. As Dr. Lott put it, “I’d seen behavior from [Jane] that seemed to be disproportionate of what she was alleging that had occurred initially about the kicking and the hitting which to me did not occur — if it did, according to her it was in the course of ... play[.]” And he found it “very, very clinically telling” that in response to questions about what her father could do to improve their *558 relationship, Jane responded, “Pay your bills.”
¶ 22. Dr. Lott, like Donald, believed Michael should be involved in Jane’s life. He thought the family needed to continue therapy, and he “should not be working with just [Jane], nor should [Jane] be the primary object of therapy.” In Dr. Lott’s opinion, “the primary object of therapy should be and should have been all along the relationship with the parents[.]” He recommended at a minimum that counseling with Michael, Lauren, Jane, and Emily continue at least one year with at least two meetings per month.
¶ 23. Dr. Lott predicted that if the parties did not “work together ... this would continue to be more of the same between [Jane] and Dad. [Jane] would be very angry, rejecting dad and it would, in fact, probably get worse.” He thought Jane’s “response has been exaggerated.” And that “it will remain and continue to be exaggerated until she sees that there is some reasonable effort on [the part of] these parents to work together, and she’s going to continue to make a huge scene.”
¶ 24. Though little testimony at trial focused on Emily, Dr. Lott explained at one point Emily had shown signs of developing the same anxiety Jane had shown about visiting her father. He also said Emily had begun mimicking the same behaviors Jane had shown toward their father.
VII. Visitation Exchanges
¶ 25. During several visitation exchanges, Jane’s anxiety about seeing her father was perhaps most apparent. As Lauren put it, Jane would often be “[s]creaming, kicking, [and] flailing” when the parties met for an exchange. One such exchange occurred at Pelahatchie Bay. When Lauren arrived, Jane moved to the back of Lauren’s vehicle, fastened a seatbelt over herself, and surrounded herself with backpacks and other items in the car. Because Jane was so distraught and inconsolable, Michael left her with Lauren and took Emily home with him.
¶ 26. The next day, Michael learned that Lauren was eating with Jane at Newk’s restaurant in Brandon, Mississippi. According to Lauren, when Michael arrived at the restaurant, the two had a verbal altercation in the parking lot. Michael allegedly threatened to call the police if Lauren did not leave Jane with him. Jane became upset and started crying. Lauren put Jane in her car and drove off with her. The next day, Lauren dropped Jane off at Michael’s house for his visitation period with her.
¶ 27. In another visitation exchange at Pelahatchie Bay, Lauren’s mother and father took the children to meet Michael. Several witnesses testified Michael and Lauren’s father, Bill Taylor, have a mutual distaste for each other. Taylor testified that during this visitation exchange, Michael tried to push him. Taylor also claimed that once the children were in Michael’s car, Michael “pretty much floored the truck, turned the truck and threw gravel all over us and our car.” Taylor added that Michael gave them “the middle finger salute.” Michael admitted accelerating rapidly and “flip[ping] ... the bird” as he left. He attributed his spat of anger to Taylor being present for the exchange. He elaborated that during visitation exchanges, Taylor often “has either a video recorder or a tape-recorder stuck up to [the children’s] face[s] and it’s uncomfortable.”
¶ 28. Dr. Lott explained that Jane’s emotional outbursts during visitation exchanges were a product of the parents “not working more together on this, [where] Mom would say, [’]You get out of the car *559 right now and you go with you’re dad.... Or else.[’]” Dr. Lott added, “Mom — and I’m not saying she’s intentionally doing this[ — ]but she’s embellishing it. She’s exacerbating it by enabling [Jane], by rescuing her. Now I don’t think that’s intentional on her part to make it worse, but that’s what’s happened.”
¶ 29. Dr. Lott explained that Jane’s emotional outbursts were not caused by fear of her father. Instead, Dr. Lott found Jane was simply “mirroring” Lauren’s disdain for Michael. Dr. Lott felt that with encouragement from Lauren to interact with Michael, Jane’s initial hysterics from seeing Michael would diffuse rather quickly. Dr. Lott provided two specific examples to support this notion.
VIII. Jane’s Improved Interactions with Michael
¶ 30. Jane did not receive any Christmas presents from her father in 2009, presumably because of the youth court’s no-contact order. After the youth court found no merit to Lauren’s allegations of child abuse and vacated its no-contact order, Dr. Lott asked Michael to give Jane her Christmas presents to “see what she does with them.” Dr. Lott thought Jane’s behavior and responses were “very clinically telling.”
¶ 31. Before Michael came into the room with Jane, Dr. Lott explained that Jane was “very upset, crying, was clinging to her mother saying, [‘]No, no, no, no, no,[’] refusing to come from behind mother. Would not sit in the chair. This went on for about 15, 20 minutes[.]” After Michael entered the room, Jane “initially remained behind Mom, refused to engage dad, but after about — it was 15, 20 minutes she started opening a present, and Mom was very instrumental in engaging in helping ... get [Jane] engaged.” Dr. Lott recounted that after Lauren encouraged Jane to interact with her father, “within 30 to 45 minutes [Jane] was in Dad’s lap, was hugging him, was opening presents[;] they were laughing and talking and engaging[.]” Dr. Lott added that “at the end of that hour, hour and a half when we left, [Jane] took her presents and was a very different child, ... and actually gave Dad a hug and a kiss as they were leaving the office[.]”
¶ 32. Dr. Lott set up another meeting where both parents took Jane shopping at Target. They shopped for items to place in Jane’s room at Michael’s house — the goal being to somewhat replicate the environment in her mother’s home. Dr. Lott observed that initially, Jane was “kind of hiding behind [Lauren] ... anxious, resistant, reluctant.” But after thirty to forty-five minutes, Jane was “on the cart with Dad and you would not have assumed— anybody [who] walk[ed] by there would not have suspected that there was any anxiety or apprehension or fear regarding this child and this dad.” Dr. Lott explained Lauren was again “instrumental” in getting the child to engage with her father.
¶ 33. Dr. Lott acknowledged that children generally respond positively to receiving gifts, but nonetheless he considered these two meetings important in explaining Jane’s anxiety issues.
IX. Chancellor’s Ruling
¶ 34. On July 19, 2010, the chancellor entered a written order finding a material change in circumstances had occurred in Lauren’s home since the entry of the original custody order on August 17, 2007. The chancellor found the change was adverse to Jane’s and Emily’s mental and emotional well-being. He further found the change was “directly caused by the actions of [Lauren].”
*560 ¶ 35. The chancellor found the best interests of the children required a change in custody, with the parties having joint physical and joint legal custody. Under the chancellor’s order, physical custody of both children alternates each week. The order prohibits grandparents from being present during custody exchanges. It also prohibits telephone contact between the children and the non-custodial parent. Michael’s child-support obligation was reduced by half. Finally, the chancellor ordered both parties to continue counseling sessions with Dr. Lott at least twice per month.
¶ 36. Lauren appeals the chancellor’s order, raising one issue which we quote verbatim: “Should the chancellor be reversed where he developed a bias and prejudice against the mother due to his misunderstanding of critical evidence, as a result of which he called her report to DHS ‘vicious’ and ‘mean-spirited’, and based his ruling on speculation rather than the evidence”?
STANDARD OF REVIEW
¶ 37. “Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record.” Henderson v. Henderson, 757 So.2d 285, 289 (¶ 19) (Miss.2000). We will not disturb a chancellor’s factual findings unless the chancellor’s decision was manifestly wrong or clearly erroneous, or the chancellor applied an improper legal standard. Wallace v. Wallace, 12 So.3d 572, 575 (¶ 12) (Miss.Ct.App.2009). We do not substitute our “judgment for that of the chancellor, even if [we disagree] with the findings of fact and would arrive at a different conclusion.” Coggin v. Coggin, 837 So.2d 772, 774 (¶ 3) (Miss.Ct.App.2003). But when reviewing a chancellor’s interpretation and application of the law, our standard of review is de novo. Tucker v. Prisock, 791 So.2d 190, 192 (¶ 10) (Miss.2001).
DISCUSSION
¶ 38. In Lauren’s brief, she frames this case as involving a single issue. She contends the chancellor “developed a bias and prejudice against the mother due to his misunderstanding of critical evidence.” Lauren questions the chancellor’s impartiality, and she asserts that many of the chancellor’s findings clearly demonstrate his bias against her.
¶ 39. In the argument section of her brief, Lauren claims several faults with the chancellor’s Albright analysis. See Albright v. Albright, 437 So.2d 1003 (Miss.1983). We point out that our rules of appellate procedure require that each issue be separately numbered in a statement of the issues. M.R.A.P. 28(a)(3). Failure to present an issue in this fashion bars the issue for appellate review. Reed v. State, 987 So.2d 1054, 1056-57 (¶¶ 6-8) (Miss.Ct.App.2008); see also M.R.A.P. 28(a)(6) (The argument section of brief “shall contain the contentions of appellant with respect to the issues presented.”). To the extent Lauren argues the chancellor committed error apart from his alleged bias, her argument is procedurally barred. Still we will address the merits of her arguments.
I. Bias and Prejudice

A. Procedural Bar

¶ 40. Lauren properly raised the chancellor’s alleged bias and prejudice in her brief. But this issue is procedurally barred for a different reason. At no point did Lauren request that the chancellor recuse himself. Nor did she object to the “multiple pejorative comments” the chancellor supposedly made, which she claims *561 demonstrate his bias. “[FJailure to move to recuse or to contemporaneously object to alleged [judicial] impropriety procedurally bars this issue from our review.” Robinson v. Burton, 49 So.3d 660, 667 (¶ 27) (Miss.Ct.App.2010) (citing Wal-Mart Stores, Inc. v. Frierson, 818 So.2d 1135, 1141 (¶ 10) (Miss.2002)). Despite this procedural bar, we will address Lauren’s allegations that the trial judge was biased and prejudiced against her.

B. The Chancellor’s Alleged Bias

¶41. Having carefully considered the allegations of judicial impropriety, we find them unfounded. Despite the initial tendency litigants may have to equate an unfavorable ruling with a judge’s bias, we urge counsel to guard against making such claims except in rare cases where they are warranted. The record shows this is not one of those rare instances. The chancellor here was in the unenviable position of making a custody determination under facts involving allegations of physical abuse of a child. For reasons explained below, we find no abuse of discretion in the chancellor’s determination that Lauren’s claim of Michael’s abuse of the children was baseless. We find the chancellor’s decision to weigh against Lauren her pernicious filing of the abuse complaint was not a reflection of the chancellor’s bias. Rather, it was a reflection of his impartial application of the law to these facts. As discussed below, we find the chancellor thoroughly considered the issues before him and remained within his discretion in making the custody award.
II. Material Change in Circumstances
¶ 42. Though Lauren focuses most of the argument section of her brief on the chancellor’s alleged bias and prejudice against her, she apparently contends the chancellor erred in finding a material change in circumstances adverse to the children had occurred since the original custody order. Thus, we address this issue.

A. Framework for Custody Modification

¶ 43. In a modification action, the party seeking a change in custody “bears the initial burden of proving there has been a material change in circumstances ... adverse to the child’s welfare.” Anderson v. Anderson, 961 So.2d 55, 58(6) (Miss.Ct.App.2007) (citing Thompson v. Thompson, 799 So.2d 919, 922 (¶ 8) (Miss.Ct.App.2001)). In determining whether a material change has occurred, chancellors are instructed to consider the totality of the circumstances. Mabus v. Mabus, 847 So.2d 815, 818 (¶ 8) (Miss.2003). If there has been a material change, chancellors must “then analyze and apply the Albright factors in light of that change.” Sturgis v. Sturgis, 792 So.2d 1020, 1025(19) (Miss.Ct.App.2001); see also Johnson v. Gray, 859 So.2d 1006, 1013 (¶ 33) (Miss.2003) (The party seeking a modification of custody must establish: “(1) there has been a substantial change in the circumstances affecting the child; (2) the change adversely affects the children’s welfare; and (3) a change in custody is in the best interest of the child.”).

B. Chancellor’s Finding of a Material Change

. ¶ 44. The chancellor made extensive findings from the bench (spanning approximately fifty pages in the record). The chancellor found Lauren had essentially utilized Jane’s hysteria during the December 28, 2009 counseling session to file a baseless abuse and neglect complaint against Michael. The chancellor further held Lauren “personally responsible for *562 ... taking not one but both of these children away from their father for a number of months.”
¶ 45. The chancellor found Donald had reported the alleged abuse because of Lauren’s phone call to her the evening of December 28, in which Lauren had told Donald she had spoken with the youth court prosecutor. The chancellor reasoned that Donald had reported the incident to “cover herself’ — not because she had any credible evidence to support the allegations.
¶ 46. The chancellor further found Lauren, who had been the custodial parent, had not been adequately disciplining the children. Lauren’s method of “discipline” was to reward the children with dried beans to place into a jar when they did something worthy of merit, and to take beans away when they “[got] into trouble.” The children could then trade the beans they had accumulated for candy or money. The chancellor told Lauren, “your discipline — beans in a bottle, it isn’t getting it.”
¶ 47. The chancellor thought Lauren “could have stopped this from the very beginning the first time [Jane] threw one of her little fits” by using some form of discipline to discourage the behavior. The chancellor stated: “[W]hen you’ve got a child who is being directly disobedient, that is the time a good parent takes immediate action.... [Lauren] is not disciplining this child when she should. She is letting [Jane] run the show. That is not good parenting whatsoever.” The chancellor stated Jane “is just a child who has a temper, and she’s learned how to get her way with you, [Lauren]. She’s learned. She’s playing you like a fiddle[;] and ... he’s the loser and, ultimately, [Jane’s] the loser[.]” And the chancellor found Lauren’s lack of discipline and poor parenting had “laid the groundwork for ... what I’m having to deal with here today.” The chancellor further reasoned:
This [case] has been made out to be about something [Michael] has done and [that] is not what this is about. This is about what [Lauren] hasn’t done and how there has been a lot of stuff going on behind closed doors that nobody is willing to sit up here and admit to that is making this child have these — -this kind of anxiety about going to see her daddy, and it is because there has been created in [Jane’s] mind something about [her] father that isn’t real that is resulting in these little temper tantrums that she’s throwing!.]
¶ 48. Notably, the chancellor found Jane’s response to Dr. Lott’s question to her about what her father could do to improve their relationship was “the most telling piece of evidence.” The chancellor concluded Jane’s response, “pay your money,” shows Jane “has heard her mama and probably her grandma and her grandfather on her mother’s side ... do nothing but talk bad about [Michael], and that’s the reason that this child is mirroring her mother[.]”
¶ 49. The chancellor also found Lauren’s father, Taylor, had contributed to Jane’s behavioral problems. The chancellor pointed out that Taylor had “candidly admitted that he had made disparaging, ugly comments and remarks about [Michael]. Children, they pick up on all this[.]” The chancellor further noted that Taylor’s filming of visitation exchanges “didn’t help [Lauren’s] case.”
¶ 50. Unlike Lauren, the chancellor found Michael to be “very believable” and “very candid.” But he also noted:
It is the Court’s observation and thus the Court’s conclusion that [Michael] is a bit of a mixed bag. There are many occasions that I believe him to be imminently reasonable and then other occa *563 sions it seems like maybe his temper gets away from him and he acts more childish and mean-spirited.
The chancellor noted Michael had directed an offensive gesture toward Taylor during a visitation exchange. But he also pointed to an example of Michael’s reasonableness — that when Jane was having “one of her tantrums,” Michael “rather than push and assert his rights, ... elected to just let the child go back home with Mama.” The chancellor further found Michael “reasonable” and “patient” for participating in counseling sessions, even after Lauren filed “a mean-spirited, vicious ... report [of abuse and neglect with] the Department of Human Serviees[.]” The chancellor acknowledged that he “suspect[ed] [Michael] was furious.”
¶ 51. Finally, the chancellor also found the younger child, Emily, was “beginning to be ... adversely harmed[.]”

C. Baseless Allegations of Child Abuse

¶ 52. We find two cases particularly instructive in rendering today’s decision. First, in Jernigan v. Jernigan, 830 So.2d 651, 652-54 (¶¶3-6) (Miss.Ct.App.2002), this Court found no error in a chancellor’s determination that a material change in circumstances had occurred where (1) the mother made allegations that the father had sexually abused their child, and (2) these allegations were not substantiated by any testimony or medical evidence. We held these considerations — when combined with other factors, including the mother’s misrepresentations to the court and her frequent changes of residence — supported the chancellor’s finding of a material change. We found particularly significant that the mother had an “outward manifestation of disdain” for the father, and she attempted to coach her child to share the same contempt for him. Id. at 653 (¶ 5). And the mother “was willing to get custody of her child at virtually any cost” — even if it sacrificed the mental and emotional health of the child. Id. Thus, a change in custody was warranted.
¶ 53. In Newsom v. Newsom, 557 So.2d 511 (Miss.1990), the Mississippi Supreme Court confronted similar concerns involving child sexual abuse. The only physical evidence supporting the abuse allegations (despite numerous examinations by several physicians) was one of the children’s swollen genitalia during one visit, and the examining doctor did not find this physical evidence supported that abuse had occurred.[4] Id. at 513-14. The supreme court found no manifest error in the chancellor’s factual finding that the mother had made false allegations of sexual abuse. Id. at 515. The supreme court further found no error in the chancellor’s modification of custody based on his findings that: (1) the mother “had subjected the children to numerous unwarranted physical and psychological examinations, not for treatment, but for investigation and interrogation”; (2) one of the children “had exhibited distress and disturbance when being returned to [the mother] at the end of a visitation period with [the father]”; and (3) the father “held a stable position and maintained a stable home” and “[h]is parents provided alternative care.” Id. at 516.
¶ 54. Instructed by Jemigan and New-som, we find no error in the chancellor’s finding of a material change in circum *564 stances. The chancellor’s factual finding that Lauren’s abuse complaint against Michael was baseless is convincingly supported by the record. Neither Dr. Lott, DHS, Donald, nor the youth court judge found that any abuse had occurred. As a result of Lauren’s actions, Michael was deprived of seeing his children for a considerable time. Because of the youth court’s no-contact order, Michael did not see Jane for approximately five months. He had no visitation with Emily for approximately three months. We find no fault with the chancellor’s determination that the children had been adversely affected by Lauren’s actions, as demonstrated by Jane’s behavior during visitation exchanges as well as her acts of self-harm, which began almost immediately after the father’s visitation with the children decreased. Further, we discern no manifest error in the chancellor’s factual finding that Lauren had spoken ill of Michael or had not been diligent in discouraging others from doing so, as evidenced by Jane’s comment that her father needed to pay his bills. The chancellor remained within his discretion in finding this environment created by Lauren had caused Jane to mirror her and have anxiety about seeing her father. Nor do we attribute fault to the chancellor’s finding that Lauren’s father’s filming of the visitation exchanges had been exacerbating Jane’s anxiety. Before leaving this issue, we turn to several of Lauren’s specific arguments.

(1) Chancellor’s Alleged Misunderstanding of Facts

¶ 55. Lauren claims the chancellor “misunderstood a crucial fact” pertaining to the abuse allegations in this case. She alleges the chancellor mistakenly believed Jane’s “initial complaint” was that her father “hits and kicks her ‘while playing,’ ” when Jane’s initial complaint, according to Lauren, was that her father “hits and kicks her.” She suggests the testimony of Jane’s therapist, Donald, demonstrates Lauren had good grounds for reporting Michael to DHS at the time she reported the incident.[5]
¶ 56. Yet Donald’s testimony as to Jane’s initial complaint on December 28, 2009, was sketchy at best. Donald claimed Jane’s revelation during this meeting was “something about being hit and kicked by her dad[.]” But Donald admitted she “couldn’t understand [Jane] honestly very well.” Donald explained that she was not sitting in a position to observe Jane’s expressions when she allegedly accused her father of abuse.
¶ 57. The youth court found no merit to Lauren’s allegation that Michael had physically abused Jane. Though the youth court initially entered a no-contact order, after receiving reports from DHS and Dr. Lott, it vacated that order and dismissed the case based on lack of evidence of abuse.
¶ 58. And neither expert (Dr. Lott and Donald) who testified in the modification hearing thought any abuse had occurred. Donald testified: “I’m not here to say [Michael is] a child abuser. I’m not here to say that he’s done something to [Jane].” Donald indeed believed Michael needed to be involved in his children’s lives. And Dr. Lott specifically found that “absolutely no abuse” had occurred. Though Dr. Lott testified Jane’s “initial complaint was that Dad ... was hitting and kicking her,” he explained this complaint was made prior to his examination of Jane. We are unable to *565 discern from the record Dr. Lott’s basis for relating what Jane’s initial complaint was before he examined her. But in any event, when Dr. Lott “got [Jane] to demonstrate to [him] and to tell [him] what had happened,” Jane said the hitting and kicking “was in the course of play.”
¶ 59. For these reasons, we disagree with Lauren’s allegation that the chancellor misunderstood what Jane’s initial complaint was. The chancellor properly focused on the fact that no credible evidence showed Lauren had good grounds for filing a complaint of abuse and neglect against Michael. The evidence preponderates heavily in the opposite direction — that she did not have a reasonable basis for filing the complaint yet chose to do so anyway. Though she insists she held a genuine belief at the time she filed the complaint that Michael had in fact abused the children, she offers no evidence for this notion other than Donald’s wavering testimony. We find no fault with the chancellor’s decision to rely on the extensive evidence showing no abuse had occurred.

(2) Chancellor’s Comments Allegedly Reflecting Bias

¶ 60. Next, Lauren claims the chancellor made “multiple pejorative comments during his ruling” clearly reflecting his bias against her. Among the comments Lauren cites is the chancellor’s comment that Lauren’s filing of an abuse-and-neglect complaint against Michael was a “mean-spirited, vicious thing.” Because substantial evidence supports that the report was groundless, we are unable to disagree with the chancellor’s characterization of Lauren’s actions. The same can be said of several other similar comments by the chancellor.

(3) Chancellor’s Finding on Lauren’s Comments About Michael

¶ 61. Lauren also claims that the chancellor speculated, without evidence, that she had been speaking negatively about Michael in Jane’s presence. We disagree. When Dr. Lott asked Jane what her father “could do to make things better with her” or to “heal this situation,” Jane replied: “Pay your bills.” This comment coming from a kindergarten-age child’s mouth is, as the chancellor recognized, “telling” circumstantial evidence that Lauren had been making derogatory comments about Michael around Jane (or, at the very least, not making a diligent effort to ensure others, such as her father, did not paint Michael in a negative light around the children). We disagree that the chancellor’s interpretation of this evidence demonstrates bias. Nor do we find manifest error in his analysis of this point.

(L) Lauren’s Discipline

¶ 62. Lauren further takes issue with the chancellor’s finding that her disciplinary method — “beans in a bottle”[6] — was inadequate. But she overlooks that the chancellor also focused on Lauren’s lack of discipline when Jane threw temper tantrums during visitation exchanges. The chancellor thought that “when you’ve got a child who is being directly disobedient, that is the time a good parent takes immediate action[.]” By all indications, Lauren did not take immediate action when Jane was being disobedient. Dr. Lott thought Lauren was exacerbating the problem by “enabling [Jane], by rescuing her.” We find no manifest error, much less any evidence of the chancellor’s bias, in his finding that Lauren’s discipline had been inadequate and had contributed to Jane’s behavioral problems.
*566 III. Albright
¶ 63. Finally, Lauren challenges the chancellor’s Albright analysis. “In all cases involving child custody, including modification, the polestar consideration is the best interest and welfare of the child.” D.M. v. D.R., 62 So.3d 920, 923 (¶ 11) (Miss.2011). The Albright factors are a guide for chancellors in weighing the facts to determine the child’s best interest. An Albright analysis is not, by any means, a mathematical equation. Lee v. Lee, 798 So.2d 1284, 1288 (¶ 15) (Miss.2001). And the factors are not meant to be weighed equally in every case. Divers v. Divers, 856 So.2d 370, 376 (¶27) (Miss.Ct.App.2003). In some cases, one or two factors may weigh more heavily and control the custody determination. Id. The supreme court has held that “[a]ll the [Albright] factors are important, but the chancellor has the ultimate discretion to weigh the evidence the way he sees fit.” Johnson v. Gray, 859 So.2d 1006, 1013-14 (¶ 36) (Miss.2003).
¶ 64. The AlbHght factors include: (1) the child’s age, health, and sex; (2) which parent had the continuity of care before the separation; (3) which parent has the best parenting skills; (4) which parent has the willingness and capacity to provide the primary child care; (5) each parent’s employment and its responsibilities; (6) each parent’s physical and mental health and age; (7) the emotional ties between the child and each parent; (8) each parent’s moral fitness; (9) the child’s home, school, and community record; (10) the child’s preference, if the child is over twelve years old; (11) the stability of the home environment; and (12) any other relevant equitable factor. Daniel v. Daniel, 770 So.2d 562, 564 (¶ 6) (Miss.Ct.App.2000) (citing Albright, 437 So.2d at 1005).

A. Chancellor’s Findings

(1) Children’s Age, Health, and Sex

¶ 65. The chancellor found these factors favored Lauren. Though the chancellor found Jane’s age was a non-factor because she was not of tender years, he found Emily’s age, then less than four years old, weighed in the mother’s favor. As to the children’s health, the chancellor noted Emily had been born with a congenital heart defect but was “doing well.” Since Lauren is a registered nurse, the chancellor found this factor favored her. The chancellor also found the children’s sex favored Lauren, due to the children’s young age and tendency to identify more with their mother.

(2) Continuity of Care PHor to the Separation

¶ 66. The chancellor found this was a “nonfactor” because “AlbHght was a divorce case, [and] I don’t take this factor into consideration except in different and unusual circumstances. The continuity of care was established by [the] Judgment of Divorce[.]”

(3) Parenting Skills

¶ 67. The chancellor found this factor favored Michael. The chancellor found the children had been taken away from Michael for “three or four months for no reason.” And after reviewing all of the youth court records, the chancellor was unable to find “one iota of any evidence whatsoever that [Michael] physically abused or harmed [Jane] in any way, nothing, absolutely zippo, nada.” The chancellor observed, “I’m not surprised [Michael] lost his temper. He shouldn’t have, but ... it doesn’t surprise me.” This observation was based on the chancellor’s findings that: (1) Michael had been deprived of seeing his children for several months as a result of Lauren’s baseless abuse complaint, and (2) Michael had “to deal with a *567 father-in-law who’s got a video camera videoing visitation exchanges.”
¶ 68. The chancellor further found Lauren had demonstrated poor parenting by talking unfavorably about Michael in the children’s presence. As evidence that this had been occurring, the chancellor cited Jane’s comment to Dr. Lott that her father needed to “pay [his] money.”
¶ 69. Though he found Michael to be the better parent, the chancellor instructed him: “[0]ne thing you don’t need to be doing is playing so hard with girls.... [I]f you play hard enough that would cause one of them to even say, [’]Daddy hits and kicks me when he’s playing with me,[’] then you’re probably playing too rough.” The chancellor also referenced Michael’s admission that he occasionally loses his temper and the incident where Michael had directed an offensive gesture at Taylor.

(If) Willingness and Capacity to Provide Primary Child Care

¶ 70. The chancellor found this factor favored Michael. Because Michael owns his own business and can set his work hours, the chancellor found he was “more able to do things for the children when they need to be done, at the time they need to be done.”

(5) Employment Responsibilities

¶ 71. The chancellor found this factor favored Michael because he is self employed and has a flexible work schedule. Lauren is a registered nurse with a more rigid 8:00 a.m. to 5:00 p.m. schedule, although the chancellor noted her work hours carry “some flexibility.”

(6) Parents’ Physical and Mental Health and Age

¶ 72. The chancellor found both parties were “age appropriate” to raise their children. The chancellor also found the parties equal regarding their physical and mental health. Though Michael has adult attention deficit disorder, the chancellor found it was managed with medication and did not impact on this factor.

(7)Emotional Ties Between Children and Each Parent

¶ 73. The chancellor found this factor favored neither party.

(8)Moral Fitness

¶ 74. The chancellor found this factor favored Michael because a man had spent the night in Lauren’s home.

(9)Home, School, and Community Record of the Children

¶ 75. The chancellor found this factor favored neither party. The chancellor noted Jane was “apparently doing great in kindergarten” and was “obviously very gifted.” But the chancellor stated: “[W]hile the children’s record is good, I don’t necessarily give [Lauren] particular credit for that.” The chancellor reiterated that Lauren had created an environment “which has caused [Jane] to be so anxious about going to see her father[.]”

(10)Preference of the Children

¶ 76. The chancellor found this factor inapplicable to the young children involved in this case, who were both less than twelve years old.

(11)Stability of the Home Environment

¶ 77. The chancellor found this factor favored Michael “for all the reasons I’ve already said.”

(12)Other Equitable Factors

¶ 78. The chancellor did not discuss any other equitable factors.

B. Lauren’s Arguments

¶ 79. Lauren argues the chancellor erred by finding the continuity-of-care factor inapplicable to modification actions. The chancellor is technically correct that Albright itself involved an initial child-cus *568 tody determination, and its articulation of the relevant factor was “continuity of care prior to the separation.” Albright, 437 So.2d at 1005. But this court has found the “continuity of care” applicable in modification actions. Brown v. White, 875 So.2d 1116, 1118-19 (¶¶ 7, 11) (Miss.Ct.App.2004); see also Watts v. Watts, 854 So.2d 11, 13 (¶ 8) (Miss.Ct.App.2003) (finding continuity-of-care factor applicable to the time period following separation).
¶ 80. Though we find the chancellor was too rigid in his application of the particular Albright factor for the continuity of care, we find it implicit in the chancellor’s ruling that he considered Lauren’s primary care of the children since the original custody order — the chancellor just found she had not been a very good primary caretaker. For example, the chancellor found that Lauren had filed a baseless abuse-and-neglect complaint against Michael, which deprived him of seeing the children for a number of months. The chancellor also found Lauren had created an environment that had caused the children to be anxious about seeing their father. And the chancellor thought Jane’s “pay your money” comment demonstrated Lauren’s poor parenting. Thus, the chancellor found Michael had the preferable parenting skills and a more stable home environment. We are unable to find manifest error in the chancellor’s resolution of the facts or his ultimate decision to modify custody.
¶ 81. Lauren also claims the chancellor erred in not finding the factor for the emotional ties between the parents and children favored her. Lauren contends the evidence is obvious that the children, particularly Jane, had a stronger attachment with her than with Michael. On the surface, it is true that Jane appears to have a closer emotional tie to her mother. But the chancellor found that Jane’s antipathy toward her father was a result of Lauren’s actions. Not only did the chancellor find she had filed a baseless claim and deprived the father of visitation for several months, he also found she had been speaking ill of Michael “behind closed doors.” As a result, Jane, who was then kindergarten age, commented that her father could improve his relationship with her by paying his bills. Thus, it is implicit why the chancellor refused to find the emotional-ties factor favored Lauren. We find no manifest error in the chancellor’s application of this factor.
¶ 82. Further, Lauren contends the chancellor should not have found the moral-fitness factor favored Michael. She points out Donald’s testimony that the children told her that a woman had accompanied Michael with them on a trip to Hat-tiesburg, Mississippi. Donald testified: “[Emily] fell asleep early so she thought that the woman stayed there in the motel room. [Jane] says no, that didn’t occur, that the lady left and that she came back early the next morning but got in the bed with her dad.” While we believe the chancellor should have considered more than the parties’ romantic relationships, we find the chancellor was within his discretion in finding this factor favored Michael for many of the reasons already discussed. Lauren’s filing of a baseless complaint of abuse, for example, certainly weighs in Michael’s favor on this factor. We find no error in the chancellor’s finding that Michael prevailed on the moral-fitness factor.
¶ 83. Under the circumstances of this case, we are unable to find the chancellor erred in determining a change in physical custody was in the best interests of the minor children. Thus, we affirm the chancellor’s judgment.
¶ 84. THE JUDGMENT OF THE RANKIN COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS *569 OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, PJJ, BARNES, ISHEE, ROBERTS, CARLTON AND RUSSELL, JJ., CONCUR. FAIR, J., NOT PARTICIPATING.

. Because of the sensitive nature of this case, which involves allegations that the father physically abused the child, we have substituted fictitious names for the parties, their children, and family members throughout this opinion.

. The agreement also contained provisions for holiday visitation.

. Dr. Lott's report submitted to the youth court quoted Jane as saying, "Pay your money,” while Dr. Lott testified Jane said, "Pay your bills.”

. The examining physician testified that "the only physical evidence of abuse was the swelling evident on February 2, 1987,” but he then admitted on cross-examination: "In my heart, I can't say there is any physical evidence to support [the children] were abused.” Id. at 514. We also note that the physician made a report under Mississippi Code Annotated section 43-21-353 (Supp.1989) based on the mother’s statements to him, though he "found no signs of molestation.” Id. at 513.

. The chancellor sustained a hearsay objection to Lauren’s testimony about Jane's comments to her during the December 28, 2009 interview. Lauren does not challenge this evidentiary ruling on appeal, which operates as a waiver of the issue. A.B. ex rel. C.D. v. Stone County Sch. Dist., 14 So.3d 794, 797 n. 1 (Miss.Ct.App.2009).

. See Issue II.B.