724 So.2d 956 (1998)
Jerry Lane MIXON, Appellant,
v.
Tori Estridge MIXON, Appellee.
No. 97-CA-01129 COA
Court of Appeals of Mississippi.
December 18, 1998.
*958 C. Gaines Baker, Batesville, Attorney for Appellant.
Robert H. Broome, Batesville, Attorney for Appellee.
BEFORE McMILLIN, P.J., COLEMAN, AND PAYNE, JJ.
PAYNE, J., for the Court:

PROCEDURAL POSTURE AND ISSUES PRESENTED
¶ 1. Tori Estridge Mixon received a divorce from Jerry Lane Mixon on the grounds of habitual cruel and inhuman treatment by decree of the Tate County Chancery Court, the Honorable Melvin McClure presiding, on July 14, 1997. From this decree, Tori was awarded custody of the couple's two minor children and $900 per month in child support, periodic alimony of $450 per month, and attorney's fees in the amount of $6,500.
¶ 2. Feeling aggrieved by the chancellor's ruling, Jerry filed this appeal asserting the following six issues:
I. WHETHER THE CHANCELLOR ERRED IN GRANTING TORI A DIVORCE BECAUSE OF HABITUAL CRUEL AND INHUMAN TREATMENT.
II. WHETHER THE CHANCELLOR ERRED IN RESTRICTING JERRY'S VISITATION PRIVILEGES.
III. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION AND COMMITTED MANIFEST ERROR IN HIS DETERMINATION OF THE CHILD SUPPORT AWARD.
IV. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION BY AWARDING TORI $450 PER MONTH IN PERIODIC ALIMONY.
V. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION IN THE EQUITABLE DISTRIBUTION OF THE MARITAL PROPERTY.
VI. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION IN AWARDING TORI ATTORNEY'S FEES.
Upon review of the record and legal precedent, we affirm as to Issues I, III, IV, and V, and reverse and render in part as to Issues II and VI.

FACTS
¶ 3. Jerry Mixon and Tori Mixon were married in September 1982. This union produced two children, a son, Justin Lane Mixon, and a daughter, Mallori Brooke Mixon. During the marriage, Tori was employed by the Department of Human Services, and Jerry was a self-employed farmer and car salesman. The couple separated in February 1996 but later reconciled. On August 22, 1996, Tori filed her complaint for divorce from Jerry on the grounds of habitual cruel and inhuman treatment, adultery, and irreconcilable differences, seeking custody of the couple's two minor children. Additionally, Tori sought a protective order, as a victim of domestic violence, from Jerry. On August 30, 1996, Jerry filed his answer and counterclaim denying all material allegations raised by Tori and claiming several affirmative defenses. On September 3, 1996, the chancellor issued an order of temporary relief for Tori giving her temporary custody of the children and ordering Jerry to pay Tori $1,000 per month in temporary maintenance for child support and residential rent. Jerry was granted bi-weekly overnight visitation with the children and both Tori and Jerry were restrained from contacting one another.
¶ 4. Subsequent to the temporary order, Tori filed complaints against Jerry for contempt of court: on October 1, 1996, Jerry was held in contempt for violating the no-contact order and for failing to pay temporary maintenance, and on November 12, 1996, Jerry was held in contempt of court for *959 violating the no-contact order and sentenced to serve forty-eight hours in jail.
¶ 5. On January 16 and 22-23, 1997, the chancellor conducted a trial on the merits in this matter. At the trial's conclusion, the chancellor issued a partial ruling, citing Jerry for contempt for having violated the no-contact order again on January 3, 1997[1] and sentenced him to serve ten days in jail. The chancellor took under advisement the remaining issues. After the parties submitted proposed findings of fact and conclusions of law, the chancellor issued a decree of divorce for Tori for habitual cruel and inhuman treatment on July 14, 1997. Tori was awarded custody of the two minor children, with permanent visitation rights afforded to Jerry. In addition, Tori was awarded $900 per month in child support, and Jerry was ordered to provide the children with medical insurance. Tori and Jerry were ordered to equally bear the costs of any uninsured medical expenses of the children. Jerry was ordered to maintain a life insurance policy in the amount of $300,000 with the children as beneficiaries. Further, Jerry requested that the children attend private school and was ordered to pay tuition for the children in this regard above the amounts paid for child support. Tori was awarded $450 per month in alimony.
¶ 6. The chancellor also divided equitably the marital property. Jerry was awarded the marital home in Lambert, Mississippi, and Tori was awarded her retirement account with the State of Mississippi. Jerry and Tori were awarded their own vehicles, and each were charged with the indebtedness remaining on their respective automobiles. Each party was awarded their own clothing and other personal effects then in their possession, with the balance of the personal property being equally divided.
¶ 7. Lastly, Tori was awarded attorney's fees in the amount of $6,500, $3,500 for fees relating to three previous contempt hearings, and $3,000 for the fees regarding the divorce. Additionally, all court costs were taxed against Jerry.

STANDARD OF REVIEW
¶ 8. The standard of review employed by this Court in domestic relations cases is abundantly clear. Chancellors are vested with broad discretion, and this Court will not disturb the chancellor's findings unless the court's actions were manifestly wrong, the court abused its discretion, or the court applied an erroneous legal standard. Sandlin v. Sandlin, 699 So.2d 1198, 1203 (Miss.1997); Johnson v. Johnson, 650 So.2d 1281, 1285 (Miss.1994); Crow v. Crow, 622 So.2d 1226, 1228 (Miss.1993); Gregg v. Montgomery, 587 So.2d 928, 931 (Miss.1991); Devereaux v. Devereaux, 493 So.2d 1310, 1312 (Miss.1986).

ANALYSIS AND DISCUSSION

I. WHETHER THE CHANCELLOR ERRED IN GRANTING TORI A DIVORCE BECAUSE OF HABITUAL CRUEL AND INHUMAN TREATMENT.
¶ 9. Jerry's first assignment of error alleges that the proof presented at the trial was insufficient for the chancellor to grant Tori a divorce on the grounds of habitual cruel and inhuman treatment. Our case law has addressed this issue on numerous occasions and is well-settled. Habitual cruel and inhuman treatment can be established by demonstrating conduct that threatens the life, limb, or health of the party seeking relief, or the conduct is so unnatural and infamous as to make disgusting and revolting to the non-offending spouse the discharge of marital duties, which erases the basis for the union. Richard v. Richard, 711 So.2d 884, 888 (Miss.1998); Bowen v. Bowen, 688 So.2d 1374, 1378 (Miss.1997); Daigle v. Daigle, 626 So.2d 140, 144 (Miss.1993); Gardner v. Gardner, 618 So.2d 108, 113-14 (Miss.1993). As a general rule, the habitual cruel and inhuman treatment must be shown to be routine and continuous; however, a single occurrence may be grounds for a divorce on this ground. *960 McKee v. Flynt, 630 So.2d 44, 48 (Miss.1993); Robinson v. Robinson, 554 So.2d 300, 303 (Miss.1989); Ellzey v. Ellzey, 253 So.2d 249, 250 (Miss.1971). The requisite essential behavior may be established by a preponderance of the evidence. Smith v. Smith, 614 So.2d 394, 396 (Miss.1993).
¶ 10. Based on our review of the evidence adduced at trial, we cannot not say that the chancellor manifestly erred in awarding Tori a divorce on the ground of habitual cruel and inhuman treatment. Jerry admitted to striking Tori during a violent confrontation at her mother's home after the separation,[2] pushing her on one occasion during the marriage, and accusing her of having a sexual affair on two occasions.
¶ 11. Tori testified that on other occasions Jerry had pushed her, shoved her into an oak bed, twisted her head, and once tried to strike her with a telephone. Further, according to Tori, Jerry berated her about her job and constantly urged her to quit, asked her vulgar questions of a sexual nature and accused her of having extramarital relationsonce brandishing a handgun and issuing threatsand was jealous of time she spent with the couple's children. Additionally, Tori testified that Jerry, on more than one occasion during the marriage, tore clocks and phones from their outlets. Tori's mother, Juanita Estridge, testified that after the couple separated Jerry came to see Tori at her home and had "roughed Tori up," thrown a mirror, and put a hole in the floor. Patricia Goodwin, a co-worker of Tori, testified that she had seen a bruise on Tori's wrist which Tori told her was the result of an argument between her and Jerry. Further, Goodwin testified that Jerry told her that he had hit Tori during the couple's confrontation at Juanita Estridge's home and that he accused Tori of adultery and "dressing like a prostitute".
¶ 12. We think there was sufficient testimony for the chancellor to conclude that Tori was a victim of habitual cruel and inhuman treatment at the hands of Jerry. The chancellor was in the best position to assess the credibility of the testimony presented at trial. Jerry offered no real refutation of the allegations presented by Tori, and he admitted to some of the allegations. Further, as Professor Hand has observed in his treatise:
Indeed, except in the case of personal violence of a serious nature, it would often be difficult or impossible to show the conduct of the defendant was such as to actually endanger the life, limb, or health or to create a reasonable apprehension thereof. Yet, the most refined crueltythe poisoned shaft of scorn, ridicule, sarcasm, contempt, insult, verbal abuse, slander, neglect, and the likeis often more painful to cultured and sensitive persons than mere blows might be.
N. Shelton Hand, MISSISSIPPI DIVORCE, CHILD CUSTODY, AND ALIMONY, § 4-12 at 72-73 (4th ed. 1996).
¶ 13. While the personal violence against Tori was not constant, it nonetheless did occur and the verbal berating and destructive acts by Jerry during his periods of outrage were more common. Suffice to say, the chancellor had sufficient evidence to grant Tori a divorce for habitual cruel and inhuman treatment. Thus, finding no manifest error or an abuse of discretion, we overrule Jerry's assignment of error in this regard and sustain the granting of the divorce on the grounds of habitual cruel and inhuman treatment.

II. WHETHER THE CHANCELLOR ERRED IN RESTRICTING JERRY'S VISITATION PRIVILEGES.
¶ 14. Jerry's next assignment of error alleges the chancellor erred in restricting his visitation with his children. Our chancery courts are vested with the responsibility of determining visitation schedules that are in the best interests of the children, and this Court gives great deference to the chancellor's discretion in this regard. Chamblee v. Chamblee, 637 So.2d 850, 861 (Miss.1994); Newsom v. Newsom, 557 So.2d 511, 517 (Miss.1990).
*961 ¶ 15. In his decree, the chancellor granted Jerry visitation on the following basis:
from July 14, 1997 through October 1, 1997, on the second Saturday of each month from 9:00 AM to 6:00 PM
from October 1, 1997 through January 1, 1998, on the second and fourth Saturdays from 9:00 AM to 6:00 PM
from January 1, 1998 through April 1, 1998, on the second and fourth weekends of each month from 6:00 PM Friday to 6:00 PM Saturday and the Farese holiday visitation schedule[3]
Holiday visitation is set forth as follows:

New Year's Day Jerry in odd years; Tori
 in even years
Easter Jerry in even years; Tori
 in odd years
Memorial Day Jerry in odd years; Tori
 in even years
July 4th Jerry in even years; Tori
 in odd years
Labor Day Jerry in odd years; Tori
 in even years
Thanksgiving Jerry in even years; Tori
 in odd years
Christmas Jerry in odd years; Tori
 in even years

On the above days, Jerry's visitation period begins at 8:00 AM and ends at 7:00 PM, except Christmas which will be from 1:00 PM on December 25 through 6:00 PM on December 26.
Jerry and Tori have visitation on Father's Day and Mother's Day, respectively, from 8:00 AM to 7:00 PM. and Jerry and Tori are to have at least 4 hours visitation on each of their respective birthdays and are to have four hours visitation on each of the children's birthdays. These visitation periods supersede the above plan and are to be honored regardless of which parent's weekend these special days may fall.
Jerry was awarded one week visitation during the summer of 1998 and two weeks during the summer of 1999.
As set forth above, visitation is a matter left to the sound discretion of the chancellor; however, chancellors, despite their best efforts, will sometimes err in setting visitation schedules. While the chancellor in this case reached an otherwise exemplary resolution of the visitation schedule, we find that he was manifestly in error in restricting Jerry's summer visitation periods to only one week in 1998 and two weeks in 1999. Mississippi Supreme Court precedent has held that the non-custodial parent is reasonably entitled to more than such an insignificant period during the summer vacation period of the children: "[w]hile not intending in any way to impose our judgment upon him [the chancellor] as to the precise visitation allowed ..., we do hold that the children at least are entitled to the company of their mother ... [for] a five week period during summer vacation." Crowson v. Moseley, 480 So.2d 1150, 1152 (Miss.1985). More recently, the Supreme Court, while not addressing the five week visitation awarded in Crowson, did reaffirm the well-settled principle that as a general rule, non-custodial parents are entitled to more than "very limited and short periods of visitation." Childers v. Childers, 717 So.2d 1279, 1286, 97-CA-00300-SCT (¶ 16) (Miss. 1998) (citing Crowson). Further, our Supreme Court has made clear that the objective in visitation arrangements is that non-custodial parents and their children "should have as close and loving relationship as possible despite the fact that they may not live in the same house." Dunn v. Dunn, 609 So.2d 1277, 1286 (Miss.1992). Finally, restrictions on the visitation rights of the non-custodial parent must be supported by evidence demonstrating that the child would be harmed in some way absent the restriction. Id. The record and the chancellor's opinion is devoid of such evidence. The chancellor's basis for the severely restricted summer visitation is the fact that Jerry had had little contact with the children during the course of the divorce proceedings. This falls short of the required finding that the restricted visitation is necessary to avoid harm to the children.
¶ 16. Thus, while we affirm the greater majority of the chancellor's visitation schedule, we reverse and render, pursuant to Crowson, granting Jerry five weeks visitation *962 with his children during the periods of their summer vacation.

III. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION AND COMMITTED MANIFEST ERROR IN HIS DETERMINATION OF THE CHILD SUPPORT AWARD.
¶ 17. Jerry's third assignment of error challenges the child support award given to Tori in the chancellor's decree. The award of child support in Mississippi is controlled by statute with some discretion left to the chancellor. See Miss.Code Ann. § 43-19-101 (Supp.1998). As a general rule, non-custodial parents are required to give twenty percent of their adjusted gross income for the support of two children. See Miss.Code Ann. § 43-19-101(1) (Supp.1998).
¶ 18. In this case, the chancellor determined the amount of child support based on an average of Jerry's salary over the previous five years, which was a gross amount of $78,000. After arriving at the gross average, the chancellor then reduced that number to $60,000 as a beginning figure for Jerry's adjusted gross income, discounted by another ten percent for a base amount of $54,000 per year. Based on this potential income, the chancellor awarded Tori $900 per month in child support. Applying the statutory formula, we find that the chancellor's calculations comply with the scheme set forth in the statute.
¶ 19. Jerry contends that his health problems along with his lingering debts from his failed farming operations, coupled with the fact that he was suspended from his automobile sales job, should have caused the chancellor to find a significantly reduced adjusted gross income. However, as is well-established, the chancellor is in the best position to assess the credibility of the witnesses and to interpret the evidence "where it is capable of more than one reasonable interpretation...." Crow v. Crow, 622 So.2d 1226, 1229 (Miss.1993); Rainey v. Rainey, 205 So.2d 514, 515 (Miss.1967). In addition to testimony regarding Jerry's poor health and financial condition, the chancellor also heard testimony to the effect that Jerry had boasted about working in a trade where his money could be hidden from official calculations. Additionally, Jerry admitted to providing an incomplete account of his assets. The chancellor made a specific finding of fact expressing his considered belief that the evidence showed that Jerry was being less than forthright about his earnings and assets. We believe that the chancellor had sufficient evidence on which to base this finding. This is not to foreclose Jerry from seeking a modification of the child support award should his financial condition change; however, based on the evidence presented, the chancellor's award was appropriate.
¶ 20. As such, since the chancellor's child support award to Tori was within the statutory scheme, and finding no abuse of discretion, other manifest error, or the erroneous application of law, we sustain the child support award in this case.

IV. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION BY AWARDING TORI $450 PER MONTH IN PERIODIC ALIMONY.
¶ 21. Jerry's fourth assignment of error attacks the chancellor's award of periodic alimony in this case. The chancellor awarded Tori $450 in alimony above the child support award. Jerry contends that this is beyond his means as demonstrated by his financial condition set forth at trial. When awarding alimony, the chancellor is to consider "the reasonable needs of the wife and the right of the husband to lead as normal a life as possible with a decent standard of living." Gray v. Gray, 562 So.2d 79, 83 (Miss.1990); Massey v. Massey, 475 So.2d 802, 803 (Miss. 1985). If a chancellor awards alimony, the amount should be "reasonable" and "commensurate with the wife's accustomed standard of living, minus her own resources, and considering the ability of the husband to pay." Gray, 562 So.2d at 82; Wood v. Wood, 495 So.2d 503, 506 (Miss.1986). As long as the chancellor follows this general standard, the amount of the award is largely within his discretion. Id.
¶ 22. In his order, the chancellor found, based on the length of the marriage and her responsibilities related to raising the two minor children, Tori was entitled to an award of alimony. We are not persuaded by *963 Jerry's financial arguments as we outlined in our resolution of Issue III. Based on the evidence, we cannot say that the chancellor abused his discretion in awarding Tori $450 per month in alimony. However, as specified earlier with regard to the child support award, our sustaining of the alimony award here is not aimed at foreclosing Jerry from seeking a modification of the alimony should his financial condition change; however, based on the evidence presented, the chancellor's award was appropriate. Accordingly, we affirm the award.

V. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION IN THE EQUITABLE DISTRIBUTION OF THE MARITAL PROPERTY.
¶ 23. Jerry's fifth assignment of error attacks the chancellor's equitable distribution of the marital property owned by the couple at the time of the divorce. In his decree, the trial judge found that the couple owned two pieces of marital property: a home in Lambert, Mississippi against which was a federal tax lien and Tori's retirement account with the State of Mississippi. The home was valued at $7,000 to $8,000 and Tori's retirement account was valued at $16,000. The chancellor awarded Tori her retirement account and Jerry the marital home. The dominant precedent in Mississippi with regard to the equitable distribution of marital property is Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994). The Mississippi Supreme Court set forth the following factors for our chancellors to consider when making an equitable distribution of marital assets:
1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
a. Direct or indirect economic contribution to the acquisition of the property;
b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
3. The market value and the emotional value of the assets subject to distribution.
4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,
8. Any other factor which in equity should be considered.
Ferguson, 639 So.2d at 928. In considering the Ferguson factors, we cannot say that the chancellor was manifestly in error in the division of the marital assets.
¶ 24. Tori began working for the Department of Human Services in 1984, at which time the retirement account was begun. Jerry alleges that he indirectly contributed to the pension plan and is therefore entitled to an equitable share, citing Hemsley v. Hemsley, 639 So.2d 909, 917 (Miss.1994) and Johnson v. Johnson, 650 So.2d 1281, 1285 (Miss. 1994), which held that every asset acquired over the life of the marriage, including a retirement savings plan, is subject to equitable distribution in a divorce proceeding. However, the Hemsley and Johnson cases do not pronounce absolute rules and the ultimate goal in equitable distribution of martial property is equity and justice to both parties with an eye toward the level of economic contribution of both parties during the marriage. Brown v. Brown, 574 So.2d 688, 691 *964 (Miss.1990); Chamblee v. Chamblee, 637 So.2d 850, 864 (Miss.1994).
¶ 25. In this case, the chancellor found that Jerry had been less than forthright with regard to his economic well-being. Additionally, Tori testified that she was unaware of the amount of money Jerry made in his car sales until 1995, and she had to prod him to pay household expenses throughout the marriage. Further, it seems apparent that the tax lien is a direct result of Jerry's unwillingness to satisfy his tax liabilities flowing from his car sales, of which Tori was not at all responsible. Based on these facts, we cannot say the chancellor erred in this regard and therefore sustain his findings regarding the equitable distribution of the marital assets.

VI. WHETHER THE CHANCELLOR ABUSED HIS DISCRETION IN AWARDING TORI ATTORNEY'S FEES.
¶ 26. Jerry's sixth and final assignment of error alleges that the chancellor abused his discretion in awarding Tori her attorney's fees in this case. In his decree, the chancellor awarded Tori $6,500 in attorney's fees. The issue of determining attorney's fees in domestic cases is largely left to the discretion of the chancellor. McKee v. McKee, 418 So.2d 764, 767 (Miss.1982); Walters v. Walters, 383 So.2d 827, 828 (Miss. 1980). The appropriate fees depend on a variety of factors including a consideration of the ability of a party to pay the fee, the skill and reputation of the attorney employed, the complexity of the case, and the degree of responsibility involved in management of the case. McKee, 418 So.2d at 767. Additionally, the amount of time and labor required, the customary charge for similar services in the community, and the preclusion of other employment by the attorney due to the acceptance of the case are relevant factors to consider. Id.
¶ 27. Jerry contends that the chancellor specifically found that Tori was capable of paying her own attorney's fees. Quite to the contrary, the chancellor found that Tori was capable of paying a portion of her own fees, but that she was entitled to a partial award of attorney's fees from Jerry. Thus, Tori was entitled to an award of attorney's fees in this case.
¶ 28. Having determined that Tori was entitled to an award of attorney's fees in this case, we turn now to the amount of attorney's fees awarded by the chancellor. First, as to the $3,000 for the divorce proceedings, the chancellor found that the McKee factors had been adequately satisfied in order to merit this award. Given our limited scope of review, we cannot say that the chancellor abused his discretion in this award and therefore sustain this portion of the award. Second, we turn to the award of attorney's fees for the contempt proceedings in this matter. The chancellor awarded Tori attorney's fees in the amount of $3,500 apportioned as follows: $500 for the first contempt, $1,000 for the second contempt, and $2,000 for the third contempt. The chancellor opined that these sums were due Tori regardless of the McKee factors, and that they were necessary as a punitive action against Jerry for his repeated contempts of the court's orders. In his statement of fees (Exhibit 11), Tori's counsel assigned the following fees for these three contempt actions: $450 for the first contempt, $50 for the second contempt, and $100 for the third contempt, for a total of $600.
¶ 29. We agree that the establishment of the McKee factors are not necessary for a contemnee to recover attorney's fees related to pursuing actions where a contemnor has wilfully violated a lawful order of the court. To hold otherwise would cause no peril to those restrained from certain conduct if they violate the orders of a court. However, the ultimate award must still be within reason. The total amount of fees submitted by Tori's counsel in this case for the three contempt actions was $600. The chancellor awarded fees of $3,500, an amount more than 500% above the actual costs incurred by Tori for these hearings. While attorney's fees are generally a matter left to the sound discretion of the chancellor, there are times when that discretion is abused, albeit with good intentions. This is the case here. Therefore, we reverse and render on this portion of attorney's fees for the actual costs for the contempt actions as set forth in the statement of fees: $600.
*965 ¶ 30. THE JUDGMENT OF THE CHANCERY COURT OF TATE COUNTY IS AFFIRMED IN PART AND REVERSED AND RENDERED IN PART. ALL COSTS OF THIS APPEAL ARE TAXED TWO-THIRDS AGAINST THE APPELLANT AND ONE-THIRD AGAINST THE APPELLEE.
BRIDGES, C.J., McMILLIN AND THOMAS, P.JJ., COLEMAN, DIAZ, HERRING, HINKEBEIN, KING AND SOUTHWICK, JJ., CONCUR.
NOTES
[1] According to the record, Tori filed a criminal stalking complaint against Jerry for the January 3, 1997 incident. Accordingly, on the advice of counsel, Jerry pled the Fifth Amendment in the contempt hearing. In Jerry's proposed findings of fact, etc., there is an indication that he was tried and acquitted of the stalking charge in Panola County Justice Court in February 1997.
[2] Jerry said that he slapped Tori on this occasion; Tori testified that Jerry struck her with a closed fist.
[3] Both parties and the chancellor reference the Farese visitation schedule, a.k.a. the Ohio plan. Having found no precedents citing this particular schedule, we adopt the schedule as set forth by Judge McClure in his opinion in this matter and order a modification as set forth in this opinion.