# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00644-COA

**TERRY LYNN ALVES-HUNTER**
         **APPELLANT/
CROSS-APPELLEE**

**v.**

**SETH HUNTER**
         **APPELLEE/
CROSS-APPELLANT**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/05/2020 |
| TRIAL JUDGE: | HON. VICKI B. DANIELS |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | HEATHER MARIE ABY |
| ATTORNEY FOR APPELLEE: | JERRY WESLEY HISAW |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED - 11/08/2022 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND EMFINGER, JJ.**

**WESTBROOKS, J., FOR THE COURT**:

¶1. Terry Alves-Hunter and Seth Hunter were granted a divorce on the sole ground of adultery by the DeSoto County Chancery Court. Terry appeals the chancery court's award to Seth of standard visitation with J.H.[1] the parties' minor child. Terry also appeals the chancery court's division of the marital estate. Seth cross-appeals the chancery court's denial of attorney's fees after Terry was found in contempt of court. Finding no reversible error in the chancery court's assessment of visitation, equitable division, or attorney's fees, we affirm the chancery court's judgment on both appeal and cross-appeal.

---

[1] We have used initials to protect the privacy of the minor child.

**FACTS AND PROCEDURAL HISTORY**

### A. Legal Proceedings

¶2. Terry and Seth were married on December 29, 2007, in Boston Massachusetts. Although no children were born of the marriage, the parties adopted J.H. in 2014. The parties moved to Mississippi in 2017, purchasing a home in DeSoto County. Seth filed for divorce in the DeSoto County Chancery Court on the ground of habitual cruel and inhuman treatment. Seth also requested sole custody of J.H. in his complaint, but at trial stipulated that Terry should have sole physical custody of the minor child. Terry answered and brought a counter-claim for divorce on the grounds of habitual cruel and inhuman treatment, habitual drunkenness, or adultery.

¶3. On August 19, 2019, the chancery court issued a temporary order that required (1) Terry to replace $3,000 she withdrew from the parties' Capitol One account; (2) granting joint legal custody of J.H. to both parties with Terry having temporary physical custody; (3) standard visitation with J.H. to Seth; and (4) $1,000 per month as child support to Terry, who also would keep the child adoption stipend for J.H. in the amount of approximately $1,083. The parties were also ordered not to further dissipate the marital estate.

¶4. On September 13, 2019, Terry filed for divorce in Massachusetts, where she, J.H., and Seth were then residing. This divorce case was dismissed by the Massachusetts court after it recognized that Mississippi had jurisdiction over the matter. Seth filed a petition for contempt in relation to this filing and also alleged that Terry had refused to allow him visitation with J.H.

¶5. On October 21, 2019, Terry filed a petition to modify the temporary order and for emergency relief. This petition noted that by the time the temporary order was negotiated, she and J.H. had already moved to Massachusetts. She requested a modification to set the meeting point between the parties and a modification to the holidays to reflect the Massachusetts public-school holidays. She also informed the chancery court that an "Abuse Prevention Order" had been issued in Massachusetts prohibiting Seth from contacting her or knowing her address. The Abuse Prevention Order was based on a violent incident that occurred when the parties were vacationing in Florida in May 2018. According to Terry, Seth had punched and choked her in a hotel room after she moved $20,000 from a joint checking account to her private account. Seth was arrested as a result of this incident, though the charges were later dropped.

¶6. The Abuse Prevention Order also extended to cover J.H. The order was modified by the Massachusetts court to allow communication relevant to financial issues and J.H.'s childcare, as well as to allow Seth to have contact with J.H. by telephone, email, and social media. The order, entered on August 9, 2019, was originally set to expire on August 19, 2019. It was extended for an additional year after modification by the Massachusetts court.

¶7. Terry filed an additional petition for emergency relief on January 29, 2020, regarding Seth's termination of her health insurance and requesting one of two marital vehicles, a Chevy Malibu, due to the repossession of her vehicle, a Mercedes. On February 24, 2020, the chancery court issued an order for temporary relief that required Seth to reinstate health insurance for Terry and J.H. The court declined to require Seth to turn over possession of

3

the Chevy Malibu. The order also required Seth to use a homeowner's insurance payment for the repair of tornado damage to the DeSoto County marital home

¶8. On July 14, 2020, Terry filed three additional motions. The first, a motion for contempt, alleged that Seth had not paid (1) for repairs to the DeSoto County home from the tornado damage; (2) the house note on the DeSoto County home; or (3) his share of medical expenses for J.H. Next, Terry asked for temporary relief as a result of being terminated during the COVID-19 pandemic. Finally, Terry asked the chancery court to modify its temporary order from August 19, 2019, to temporarily suspend Seth's in-person visitation with J.H. because Seth had only participated in one short visit with J.H. since November 2019.

¶9. On July 27, 2020, the chancery court entered its order for contempt nunc pro tunc to November 4, 2019. The chancery court ruled, among other things, that Terry violated the court's order by refusing to have J.H. at the designated place and time for Seth to exercise his court-ordered visitation. On August 3, 2020, the court entered an order on the second petition for temporary relief, granting Terry $800 in temporary spousal support with the stipulation that the alimony "shall be reduced dollar for dollar by the amount of any federal unemployment benefit" she received.

### B. Trial

#### 1. Seth's Testimony

¶10. On October 6, 2020, a trial commenced on the matter. During the trial Seth testified that the cause of the separation was the altercation that had occurred in a Florida hotel. Seth

4

testified about several unsettling incidents with Terry, including when he alleged she

(1) failed for years to inform him that they received an adoption stipend for J.H.;

(2) signed his name to the adoption subsidy contract without his permission or consent;

(3) filed child endangerment and neglect charges after an aborted visit with J.H. (No wrongdoing was found after the protective services investigation.);

(4) provided a misspelled email address to J.H.'s therapist, resulting in Seth not receiving the therapist's emails;

(5) surrendered the registration title for the Chevy Malibu to the DeSoto County Tax Collector's office, which prevented Seth from renewing the expired tag in Massachusetts, then calling the police regarding the expired tag;

(6) placed a tracker on the Chevy Malibu the same day the registration expired, which was recorded by security cameras;

(7) removed the COVID-19 forbearance Seth placed on the DeSoto County marital home, which Seth later reinstated;

(8) accepted his alimony payments even though she was collecting unemployment (going against the court's previous order);

(9) transferred and subsequently dissipated large sums of marital money to her banking accounts (this amount includes the $20,000 transfer Terry admitted to which both parties agree was the basis of the Florida argument);

(10) refinanced a Massachusetts house that the couple lived in for approximately nine years after their marriage that was in her name alone, and took all of the equity (approximately $25,000) out of the house, keeping it for herself;

(11) "charg[ed] up" her credit cards after the parties refinanced their DeSoto County home and used the equity cash out to pay off their credit cards (Seth testified a second refinance on the DeSoto County home in the amount of $8,000 was used for household bills and repairs); and

(12) he acquired Terry's address (which was impounded by order of the

5

Massachusetts trial court, and Seth was not supposed to know it) because he received a credit alert that someone at Terry's address was attempting to use his credit.

Seth also testified at length regarding the couple's premarital and joint assets.

### 2. Terry's Testimony

#### a. Assets

¶11. Terry also testified regarding the parties' assets and the location of various amounts of marital funds. She also testified that the DeSoto County home, then under contract, was expected to yield $6,000 after its sale. She explained that her federal unemployment had been paused because of some potential identity fraud related to her impounded address, though the payment resumed later without resolving who used her address to make the fraudulent request. She discussed and described the eleven credit card accounts listed on her Rule 8.05 financial statement. UCCR 8.05. She testified at length regarding J.H.'s special needs and services provided to him by the State of Massachusetts and regarding Seth's lack of participation in these appointments.

#### b. Adultery

¶12. Terry testified regarding the ground of adultery, noting bank charges for online adult websites and that Seth's phone contained "Google locations" that showed him at massage parlors that were later shut down for prostitution. She also described a May 2018 email between Seth and another woman, stating that "he wanted to get together and sizzle up the sheets." Seth later stipulated to divorce on the adultery ground without any testimony regarding the matter. There was no testimony from either party regarding financial resources

6

used to perpetuate the adultery.

### c.     Visitation

¶13.    After this brief mention regarding the sole ground for divorce, Terry also related how after the aborted visitation with Seth in November, J.H. "was crying[,] He was shaking. He was saying that his father was swearing at him . . . he was . . . not in a good place." She next testified about calling the child protective services in Massachusetts to file a neglect report because Seth was screaming at J.H., who, as a special needs child, was disproportionally impacted by Seth's actions.[2] Terry also testified about $20,000 Seth had removed from joint accounts in 2017.  She adamantly denied attempting to open credit in Seth's name.  Terry also described how her Mercedes was repossessed after Seth failed to make payments on it (but noted that the car was in her name).  She requested the court to require Seth to pay the balance on the Mercedes loan because the Mercedes was a gift from Seth.

### C.     *Chancery Court's Ruling*

¶14.    The chancery court immediately proceeded with its ruling, first granting Terry a divorce on the ground of adultery, which Seth stipulated to.  Next, the court granted joint legal custody of J.H. to both parents with Terry receiving physical custody, again, which was not in dispute.  The court granted standard visitation to Seth, to be clarified in its order, and admonished Terry to "help facilitate this visitation."

¶15.    The chancery court then proceeded with equitable distribution, outlining the

---

[2] According to Terry's testimony, J.H.'s special needs are related to his past experience as a foster child and include post-traumatic stress disorder, reactive attachment disorder, pervasive developmental delay, and attention deficit and hyperactivity disorder.

7

guidelines from *Ferguson*[3] that must be considered. It determined the point of separation to be August 2019 when the temporary order was signed by the chancery court. The chancellor noted that because the parties' attorneys did not give an asset list, she would use the Rule 8.05 accounting and testimony from the parties for her determinations. The chancery court noted that the majority of the personal property had already been divided by the parties, and valued the assets based on the undisputed numbers reported on the Rule 8.05 financial statement. She noted that the amounts of personal property listed on Terry's Rule 8.05 financial statement were approximately "an even split," with each party getting approximately $15,000 of the $31,600 in valued personal property. The court then awarded Terry, among other things, the anticipated $6,000 in equity from the DeSoto County marital home. The $20,000 cash that Terry transferred prior to the separation was determined to be a marital asset and was awarded to Terry as well. Seth's retirement account,[4] valued at approximately $91,000, was determined to be marital property. Seth also received two cars that were marital property, valued at $4,000, after Terry testified she did not want them. Terry received all of her retirement account, although the court classified $14,982 (half) of the account as marital. According to the court's bench ruling, this gave Terry assets totaling "$42,298," with Seth receiving $95,948. To equalize the disparity between the parties, Seth was required to transfer $25,000 from his retirement account to Terry.

¶16.    The chancery court further noted that each party would be required to pay his and her

_____

[3] *Ferguson v. Ferguson*, 639 So. 2d 921 (Miss. 1994).

[4] Seth's retirement account is also called his "Thrift Saving Plan," and these terms are used interchangeably in the record.

8

own debts, instead of dividing the debt as is typically done. The court specifically pointed out its reasoning for this decision was the testimony indicated that the refinance cash out was used to pay some of the credit card debt, which Terry continued to "run back up." She noted that all the credit cards debts were in Terry's name, which was "not something [Seth] had control over." Seth listed no credit card debt on his Rule 8.05 financial statement. The chancery court determined the credit card debt was a dissipation of assets per the *Ferguson* factors. The chancery court also declined to require Seth to pay the balance of the repossessed Mercedes as Terry requested. The court determined that Terry decided to let the Mercedes go back instead of attempting to resell the car or making a similar attempt to prevent the deficiency.

¶17. The court next addressed the Abuse Prevention Order in relation to the prevention of the exchange of addresses between parties for J.H.'s benefit. The court found that, although one violent incident had occurred, there was not a course of conduct or history of domestic violence and abuse in the marriage. The court indicated that it believed Terry was "interfering with [Seth's] visitation" but it declined to hold her in contempt for that matter.

### D. Subsequent Pleadings

¶18. In the written judgment of divorce dated November 5, 2020, the chancery court set forth a specific schedule for visitation. The chancery court set the amount of child support for J.H. in the amount of $1,100 per month. The court reiterated the specified the amounts of marital property to go to each party and found Terry to be in contempt of court solely for her "actions in regards to interfering with [Seth's] use . . . of the Malibu vehicle." The court

9

declined to hold Terry in contempt for dissipating funds or failure to abide by the visitation orders. The court further declined to require Terry to pay Seth's attorney fees regarding the contempt proceedings.

¶19. On November 13, 2020, Seth filed a motion for reconsideration, requesting the chancery court not to award $6,000 in equity from the sale of the DeSoto County home to Terry because Seth paid $7,265 in closing costs on the home after Terry refused to pay any of the costs. On November 14, 2020, Terry filed a motion for reconsideration requesting the court to (1) correct typos regarding J.H.'s age; (2) recognize that she would not be receiving $6,000 in equity from the sale of the DeSoto County house that the court awarded her, and the court to readjust the equitable division to reflect that lack of receipt. (She alleged here that Seth was not paying the payment on the DeSoto County property, which Seth testified was because the mortgage was in COVID-19 forbearance. Terry asserted the months of forbearance reduced the equity she would receive from the house sale.) Under this point she asked the court to adjust the equitable division of marital property to compensate for Seth's failure to pay the house note, resulting in no proceeds being available from the house sale; (3) rule on her prior filed petition for contempt; (4) require Seth to pay unpaid alimony in the amount of $700; (5) appropriately value Seth's retirement closer to the line of demarcation, and (6) consider that Seth removed money from the joint accounts of the parties that was not accounted for in the division of the marital estate.

¶20. On May 13, 2021, the chancery court issued an order denying Seth's motion for reconsideration. The court granted Terry's motion for reconsideration in part, amending the

divorce judgment to reflect J.H.'s correct age. The court denied Terry's request to recalculate the equitable division over the $6,000 in equity, finding that "[Seth] had to pay the deficiency of $7,265.60 out of his pocket . . . . [Terry] was awarded $6000 from the sale of the home, which she did not receive, so both parties suffered a loss in approximately equal amounts therefore no adjustment of the equitable distribution is necessary." The court declined to address Terry's motion for contempt because "the contempt was not addressed at trial and the chance to litigate this issue has passed." The court also declined to revalue Seth's retirement, because the court used the evidence at trial to value the plan, and "the court cannot assess any further value to the [savings] than the evidence that was given." The chancery court denied the alimony request as well, specifically noting that there was conflicting testimony regarding this at trial, and "[b]ased on the Court's determination of the credibility of the witnesses, the Court resolved that conflict and determined [Terry] was not owed any back alimony at the time of trial." Finally, the court denied Terry's request to reconsider Seth's removal of marital funds in the equitable division the way the court considered Terry's "because there was testimony at trial that both parties removed marital funds. There was also testimony that some of these funds were used [by Seth] for marital expenses and towards the marital home. The Court took all of this into consideration when making an equitable distribution."

¶21.    Aggrieved by these decisions, Terry appealed, claiming the chancery court erred in its assessment of the property division and in the award of standard visitation with J.H. to Seth. Seth cross-appealed, asserting the chancery court erred when it failed to award him

11

attorney's fees after Terry was found in contempt of court.

## STANDARD OF REVIEW

¶22. This Court "applies a limited standard of review on appeals from chancery court." *Tucker v. Prisock*, 791 So. 2d 190, 192 (¶10) (Miss. 2001) (citing *Reddell v. Reddell*, 696 So. 2d 287, 288 (Miss. 1997)). "The scope of review for the issue of custody and other similar domestic relations matters is quite limited." *Chamblee v. Chamblee*, 637 So. 2d 850, 860 (Miss. 1994). "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence[.]" *Tidmore v. Tidmore*, 114 So. 3d 753, 757 (¶8) (Miss. Ct. App. 2013) (quoting *Wilson v. Wilson*, 79 So. 3d 551, 560 (¶37) (Miss. Ct. App. 2012)). Additionally, "[t]his Court employs a limited standard of review of property division and distribution in divorce cases." *Bowen v. Bowen*, 982 So. 2d 385, 393 (¶32) (Miss. 2008) (citing *Owen v. Owen*, 928 So. 2d 156, 160 (¶10) (Miss. 2006)). "This court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Chamblee*, 637 So. 2d at 860 (citing *Bell v. Parker*, 563 So. 2d 594, 596-97 (Miss. 1990)).

## DISCUSSION

### I. Visitation

¶23. In her first assignment of error, Terry contends that the chancery court erred when it awarded standard visitation to Seth. She asserts that the chancellor did not take into account J.H.'s best interests, failing to consider J.H.'s distress after his aborted fifteen-minute visit

with his father in November 2019 and ignoring the domestic-abuse protection order in place. We disagree.

¶24. "The chancellor has broad discretion when determining appropriate visitation and the limitations thereon." *Harrington v. Harrington*, 648 So. 2d 543, 545 (Miss. 1994). "When the chancellor determines visitation, he must keep the best interest of the child as his paramount concern while always being attentive to the rights of the non-custodial parent, recognizing the need to maintain a healthy, loving relationship between the non-custodial parent and his child." *Id.* "Mississippi law provides that a noncustodial parent is entitled to significant visitation with a child under circumstances that foster a close relationship." *Jaggers v. Magruder*, 129 So. 3d 965, 969 (¶21) (Miss. Ct. App. 2014). "Non-custodial parents are entitled to more than 'very limited and short periods of visitation.'" *Mixon v. Mixon*, 724 So. 2d 956, 961 (¶15) (Miss. Ct. App. 1998) (quoting *Childers v. Childers*, 717 So. 2d 1279, 1282 (¶16) (Miss. 1998)). Furthermore, the Supreme Court has repeatedly stated "that there must be evidence presented that a particular restriction on visitation is necessary to avoid harm to the child before a chancellor may properly impose the restriction[,] . . . [or] the chancellor's imposition of a restriction on a non-custodial parent's visitation is manifest error and an abuse of discretion." *Harrington*, 648 So. 2d at 545 (citing *Dunn v. Dunn*, 609 So. 2d 1277, 1286 (Miss. 1992); *Wood v. Wood*, 579 So. 2d 1271 (Miss. 1991)).

¶25. In the present case, Terry points to J.H.'s distress after his visit with his father, as well as the Abuse Prevention Order from Massachusetts, as evidence that Seth's visitation should

13

be restricted. But the chancery court weighed these factors when determining visitation, specifically finding that the protection order was not based on a history of domestic violence or a course of conduct by Seth. The chancery court also noted that based on the testimony of the parties, Terry was "doing everything you can to make [J.H.] be fearful of his father," and Terry needed to facilitate visitation, which was Seth's right as a parent. Given the court's clear consideration of these factors, in addition to our limited scope of review, we cannot say that the chancery court abused its discretion in this determination. Accordingly, the determination on this issue is affirmed.

## II. Equitable Division of Property

### A. Discussion of the Ferguson Factors

¶26. Next, Terry asserts that the court erred in its equitable division of the marital estate. She alleges that the chancery court failed to follow the *Ferguson* factors regarding equitable division. She points to three particular pieces of property: (1) the chancellor's failure to replace the $6,000 in equity from the sale of the DeSoto County home, which was awarded to her but not received; (2) the chancellor's failure to consider that Terry alleged Seth removed $20,000 from the marital estate,[5] which mirrored Terry's removal of $20,000 from

---

[5] Neither Terry's brief nor the record is clear where the $20,000 amount Terry refers to derives from. Terry's testified that $20,000 was removed from the DeSoto property during a refinance and used for home repairs. There is also testimony from Terry that after a $70,000 windfall from the sale of the Boston home, $50,000 "went into the home here in Mississippi;" and $20,000 was given to Seth "that was supposed to be used towards school, . . . and the rest of the money sat in my account" until $20,000 was invested. (A $25,000 return on investment was received in 2019, which was placed in Terry's checking account.) This testimony lists amounts in excess of $70,000. Mississippi Rule of Appellate Procedure 28(a)(6) states, "The argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities,

14

the parties' joint checking accounts. (In Terry's case, the $20,000 was added to her ledger during the property division; however, Seth's withdrawal was not.) and (3) the chancellor's division of Seth's $90,000 retirement account, which was not divided equally between the parties. She also alleges that the chancery court's lack of consideration regarding Seth's admission of adultery was in error, as well as the decision to forego alimony. Again, we disagree and find no abuse of discretion in the chancery court's determinations.

¶27. When a chancery court performs an equitable division, the "first step before division of the assets is for the chancellor to characterize the parties' assets as marital or non-marital." *Craft v. Craft*, 825 So. 2d 605, 608 (¶11) (Miss. 2002) (citing *Johnson v. Johnson*, 650 So. 2d 1281, 1287 (Miss. 1994)). "Marital property is defined as 'any and all property acquired or accumulated during the marriage.'" *Bowen*, 982 So. 2d at 395 (¶41) (quoting *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994)). "The second step is for the chancellor to equitably divide the marital property according to the guidelines set forth in *Ferguson* . . . ." *Craft*, 825 So. 2d at 608 (¶11). "If there are sufficient marital assets which, when equitably divided and considered with each spouse's marital assets, will adequately provide for both parties, no more need be done." *Id.* (citing *Johnson*, 650 So. 2d at 1287). Where there is a deficit left for one of the parties, alimony is used to remedy the deficit. *Id.*

¶28. The *Ferguson* factors the Mississippi Supreme Court set forth to determine and

statutes, *and parts of the record relied on.*" *Jefferson v. State*, 138 So. 3d 263, 265 (¶8) (Miss. Ct. App. 2014) (emphasis added). Because "there is a presumption that the judgment of the trial court is correct and the burden is on the Appellant to demonstrate some reversible error to [the appellate court]." *Id.* (quoting *Birkhead v. State*, 57 So. 3d 1223, 1231 (¶28) (Miss. 2011)). Terry's failure to specify in her brief or in the record the details of this allegation means that this point must fail for this additional reason.

equitable distribution of marital assets are as follows:

> 1. Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
>
>> a. Direct or indirect economic contribution to the acquisition of the property;
>>
>> b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
>>
>> c. Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
>
> 2. The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
>
> 3. The market value and the emotional value of the assets subject to distribution.
>
> 4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;
>
> 5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;
>
> 6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;
>
> 7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and
>
> 8. Any other factor which in equity should be considered.

*Ferguson*, 639 So. 2d at 928.  Although not explicitly stated, marital fault is considered in

the context of the *Ferguson* factors.  *Driste v. Driste*, 738 So. 2d 763, 768 (¶21) (Miss. Ct.

16

App. 1998).

¶29.     "[T]he [S]upreme [C]ourt has held that the chancellor is only required to address those [*Ferguson*] factors that are relevant to the case at hand." *Seghini v. Seghini*, 42 So. 3d 635, 641 (¶21) (Miss. Ct. App. 2010) (citing *Weathersby v. Weathersby*, 693 So. 2d 1348, 1354 (Miss. 1997)). "Moreover, this Court has held that failure to make an explicit factor-by-factor analysis does not necessarily require reversal where we are satisfied that the chancellor considered the relevant facts." *Id.* (citing *Palmer v. Palmer*, 841 So. 2d 185, 190 (¶18) (Miss. Ct. App. 2003)).

¶30.     In the present case, the chancery court discussed multiple *Ferguson* factors at length during its ruling from the bench, clearly explaining the division process to the parties. The court made a second, more general, mention of the *Ferguson* factors in its order. While not every *Ferguson* factor was analyzed, the court focused heavily on Terry's dissipation of the assets, closely examining the degree to which she expended the parties' marital assets. The chancery court also analyzed the substantial contribution to the accumulation of the property by each party and the market value of the property during her ruling from the bench. In this case there was very little dispute regarding which property was marital, and both parties offered clear, undisputed valuations of all their assets in their Rule 8.05 financial statements.

¶31.     Importantly, adultery was the sole ground for divorce. Terry briefly testified about this ground, and Seth stipulated that adultery occurred. The chancery court failed to mention adultery in the context of property division. Our Supreme Court repeatedly has reversed and remanded cases when the chancellor did not consider how an extramarital affair "impacted

17

and burdened the stability and harmony of the marriage." *Watson v. Watson*, 882 So. 2d 95, 108 (¶68) (Miss. 2004) (quoting *Singley v. Singley*, 846 So. 2d 1004, 1009 (¶13)). "Marital misconduct is a factor entitled to be given weight by the chancellor when the misconduct places a burden on the stability and harmony of the marital and family relationship." *Ory v. Ory*, 936 So. 2d 405, 413 (¶23) (Miss. Ct. App. 2006) (citing *Singley*, 846 So. 2d at 1007 (¶8)). Even so, this Court in *Ory* found no error after a chancellor did not consider marital fault when it distributed the assets but failed take into account one spouse's adultery. *Id*. There, this Court determined that when "[a spouse] put forth no evidence to show that [the offending spouse's adulterous] conduct affected the stability of the marriage," it was not an error to fail to consider it when distributing assets. *Id*. "Had [the spouse] put forth some evidence of how [the offending spouse's] conduct affected the marriage, it is possible that the chancellor might have erred in ignoring that proof." *Id*.

¶32. Here, the chancery court briefly mentioned in its ruling from the bench that "I do not believe that this separation occurred solely because of Mr. Hunter's [adulterous] activities." Furthermore, there is no evidence in the record of how the adulterous conduct "place[d] a burden on the stability and harmony of the marital and family relationship." *Id*. Terry's testimony only refers to (1) pornographic website charges; (2) Seth's presence at massage parlors; and (3) a sexual email sent to a co-worker a year before the couple filed for divorce. There is no mention of marital assets in relation to Seth's adulterous activities. In fact, there is no proof in the record regarding how the affair impacted the marriage at all—and although it was the sole cause of the divorce—how it contributed to the demise of the marriage. No

18

evidence was given. Because of this lack of evidence regarding marital fault, the chancery court's mentioning that the adulterous activities were not the sole cause of the separation, and the chancery court's in-depth discussion of the *Ferguson* factors the court considered relevant, we must affirm the chancery court's application of the *Ferguson* factors.

### B. Specific Property Divided by the Chancery Court

¶33. In this case, the chancery court did not replace the $6,000 it awarded Terry in the judgment of divorce because the court found in its order for the motions on reconsideration that Seth alone spent over $7,000 in closing costs during the sale of the DeSoto County home. The court found that both parties "suffered a loss in approximately equal amounts" and declined to adjust the equitable distribution. The chancery court, in the same order, also specifically addressed Terry's contention regarding its failure to consider Seth's removal of $20,000 from the marital estate. In its order, the court explicitly noted that it took this fact into consideration and determined that the money removed by Seth was used for home repairs and bills, based on his testimony, as opposed to the $20,000 Terry removed, which was never accounted for. Finally, the court explained from the bench that it did not equally divide Seth's retirement fund but instead used the fund to make an equitable distribution. The chancery court's written calculation is as follows:

Terry:

1) $14,982 - value of half of Terry's retirement determined to be marital property

2) $6,000 - equity from the sale of the DeSoto County home

3) $20,000 - funds Terry withdrew from joint account

19

$40,982[6]

Seth:

1) $91,948 - value of Seth's retirement account

2) $4,000 - value of Chevy Malibu and Honda Ridgeline

$95,945

This division left an imbalance of $54,963 in Seth's favor between the two parties. To rectify this imbalance, the court ordered Seth to pay $25,000 from his retirement account to Terry. This resulted in the final tally for the equitable division as Terry receiving $65,982 and Seth receiving $70,945.

¶34.    "[A]n equitable division of property does not necessarily mean an equal division of property." *Chamblee*, 637 So. 2d at 863-64. "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence." *Tidmore*, 114 So. 3d at 757 (¶8) (quoting *Wilson*, 79 So. 3d at 560 (¶37)). Here the chancery court used its discretion to fashion what it believed to be an equitable division of property between the parties. This did not require the chancery court to split Seth's retirement account equally. This division was based on the testimony of the parties and their sworn Rule 8.05 financial statements. Because these determinations were based on substantial credible evidence presented by the parties, we cannot say that the chancery court was in error.

**III.    Attorney's Fees in a Contempt Case**

---

[6] In its ruling from the bench, the chancery court added Terry's $2,000 Saab vehicle to her share, but in its judgment, the court determined the car was separate property.

¶35. Seth's sole issue on cross-appeal is his assertion that the chancery court erred when it failed to award him attorney's fees after Terry was found in contempt of court. Because we have a limited scope of review, we cannot say the chancery court abused its discretion in this matter, and thus find no error in the chancery court's determination.

¶36. "An award of attorney's fees in a contempt case is proper." *Newell v. Hinton*, 556 So. 2d 1037, 1043 (Miss. 1990). However, "the matter of awarding attorney's fees is largely entrusted to the sound discretion of the chancellor." *Tidmore*, 114 So. 3d at 757 (¶9) (quoting *Evans v. Evans*, 75 So. 3d 1083, 1089 (¶22) (Miss. Ct. App. 2011)). This court is "reluctant to disturb a chancellor's discretionary determination whether to award attorney's fees or the amount of any award." *Id*. "[I]t is well established that '[a] chancellor *may* award attorney's fees as the result of a contempt action' in a domestic-relations case." *Id.* at 758 (¶10) (emphasis added) (quoting *Mixon v. Sharp*, 853 So. 2d 834, 841 (¶32) (Miss. Ct. App. 2003)). "One of the purposes for awarding attorney fees [in a contempt action] is to compensate the prevailing party for losses sustained by reason of the defendant's noncompliance." *Id*. (quoting *Durr v. Durr*, 912 So. 2d 1033, 1040 (¶25) (Miss. Ct. App. 2005)).

¶37. Although Terry was found to be in contempt, the chancery court declined to award attorney's fees to Seth. The court did not explain its determination in this matter. However, nothing in the caselaw indicates that it is mandatory for a chancellor to assess attorney's fees when one party is in contempt. Additionally, "where the chancellor has made no specific findings, we will proceed on the assumption that he resolved all such fact issues in favor of

21

the [cross-]appellee." *Ferrara v. Walters*, 919 So. 2d 876, 881 (¶8) (Miss. 2005). Accordingly, we find that the chancery court did not err when it declined to award attorney's fees to Seth, which was fully within its discretion to do.

## CONCLUSION

¶38. After a thorough review of the record, we find no reversible error in the chancery court's determinations. We affirm the chancery court's decision to award standard visitation to Seth, its equitable division of the property, and its denial of attorney's fees to Seth.

¶39. **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**